Kathleen LENTINI, Plaintiff–Appellee,

v.

CALIFORNIA CENTER FOR THE ARTS, ESCONDIDO; Alan Corbin; Randy Vogel, Defendants–Appellants,

and

Does 1–10, Defendant.

No. 01–56612.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 30, 2004.

File May 27, 2004.

---

Michael Hogan, Hogan Guiney Dick, LLP, San Diego, CA, for the defendants-appellants.

Amy B. Vandeveld, San Diego, CA, for the plaintiff-appellee.

Before: GOODWIN, PREGERSON, and TALLMAN, Circuit Judges.

PREGERSON, Circuit Judge.

This case comes to us following a bench trial that resulted in a judgment against the defendants-appellants. For the reasons discussed below, we affirm the district court's judgment in all respects.

## BACKGROUND

### A. Factual History

Appellee Kathleen Lentini is a quadriplegic and uses a wheelchair for mobility. At all relevant times, Lentini had a small, black Shih Tzu/Poodle mix named Jazz. Jazz functions as Lentini's service dog by providing minimal protection and retrieving small dropped items.[1]

---

1. Regulations promulgated under the Americans with Disabilities Act define "service animal" as

 any guide dog, signal dog, or other animal individually trained to do work or perform tasks for the benefit of an individual with a disability, including, but not limited to, guiding individuals with impaired vision, alerting individuals with impaired hearing to intruders or sounds, providing minimal

Appellant California Center for the Arts—Escondido (the "Center") is a not-for-profit public benefit corporation, founded to promote the advancement of artistic entertainment and education. At all relevant times, appellant Alan Corbin was the Center's House Manager, and appellant Randall Vogel was the Director of Center Sales and Event Services. At all relevant times, the Center had a written policy stating that "animals are not permitted in the theater, except for certified assistance animals accompanying people with disabilities." "Certified" meant any animal officially trained to assist a person with a disability. The Center also had an unwritten policy that ticket takers were to admit any "recognizable" service animals without any questions; "recognizable" animals were those wearing an outer garment or some other identifying device.

Lentini attended approximately ten or eleven events at the Center with Jazz during the Center's 1997 and 1998 seasons. On each of these occasions, she was initially told that she could not enter the Center with her dog. However, after she explained that Jazz was a service dog, Lentini and Jazz were both admitted.

In October 1998, Lentini and Jazz attended an R. Carlos Nakai concert at the Center. During intermission, Jazz either yipped [2] or barked when an individual approached Lentini; Jazz made no further noises after Lentini advised Jazz that it was "okay." Vogel was on duty at this performance. He believed that he heard a dog bark, but he did not feel a need to stop the disturbance. He did not mention the noise to Lentini despite the fact that he spoke with her after the concert about parking issues and a lack of a ramp for disabled persons. No patrons complained about the incident.

Also in October 1998, Lentini and Jazz attended a performance of "The Music Man" at the Center. During intermission, Jazz again yipped or emitted a small barking noise when individuals seated nearby were returning to their seats and Jazz apparently perceived them to be in his and Lentini's territory. Again, once Lentini advised Jazz that everything was "okay," he made no further noises. No complaints were made to Center staff. But at some point prior to January 13, 1999, Vogel instructed Center staff not to let Lentini back in with her dog.

On January 13, 1999, Lentini and Jazz attempted to attend a dance performance at the Center entitled "Tango Buenos Aires." On that night, Corbin was the House Manager on duty. He told Lentini that she could not enter the theater with Jazz. Although Lentini explained that Jazz was a service dog, Corbin still refused admittance to Lentini and Jazz because of Jazz's barking at the two prior performances. [3] Notwithstanding Corbin's refusal, Lentini entered the theater with Jazz. Corbin spoke with Bruce Beers, the Center's Director of Operations. Beers believed that Jazz was the dog that Vogel had heard at the R. Carlos Nakai concert. He recommended that Corbin tell the Center's security staff to instruct Lentini to remove

---

protection or rescue work, pulling a wheelchair, or fetching dropped items. 28 C.F.R. § 36.104.

2. The district court indicated that a yip is a "muffled bark" or the bark of a small dog.

3. As discussed below, both Corbin and Vogel later provided a false, pre-textual explanation for why Lentini was refused admittance.

Jazz from the premises and, if she refused, to call the Escondido police to have the dog removed.

Center Security Officer Aaron Sale spoke with Lentini and told her that she was not permitted to bring her dog into the concert hall. Sale told her that she could attend the performance if she left Jazz in the car. Apparently this was not an option because of cold weather that night. Moreover, Lentini and Jazz work as a team and placing Jazz in the car would disrupt the bond that was created between them as a result of Jazz's training.

When Lentini refused to leave the premises with Jazz, the Center staff called the Escondido Police Department at Corbin's direction. Escondido Police Officers Joe Creed and Paul Woodward came and spoke with Lentini and Corbin. Corbin told them that Lentini was not allowed in the theater with Jazz because the dog had caused a prior disturbance. Corbin stated that Lentini could attend the performance if she put Jazz in her car. These conversations occurred in a calm manner, and Jazz made no disturbances at that time. Nevertheless, the attempted mediation by the police officers failed, and Corbin indicated that he was prepared to sign a citizen's arrest in order to have Lentini arrested and removed from the premises. Upon learning this, Lentini agreed to leave in exchange for a promised refund of her tickets.

Immediately after this incident, Lentini suffered from severe body shakes, which created difficulty in steering her wheelchair. Lentini required the assistance of her companion, Richard Maciel, before she was able to drive safely home. On or about February 16, 1999, the Center sent Lentini her refund and included a brochure for the upcoming performance season.

B. *Procedural History*

Lentini filed suit against the Center, Corbin, Vogel, and Does 1 through 10 on August 23, 1999. Her complaint included claims under Title III of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (the "ADA"), under California's Unruh and Disabled Persons Acts, California Civil Code §§ 51 *et seq.*, 52 *et seq.*, and 54 *et seq.*, and for negligence. The complaint included additional claims for declaratory and injunctive relief.

On cross-motions for summary judgment, the district court disposed of claims related to architectural barriers in the Center as well as Lentini's claim that she was acting on behalf of all persons similarly situated. A bench trial was held between March 27 and April 3, 2001. On August 13, 2001, the district court filed its findings of fact and conclusions of law, finding in favor of Lentini on all counts except for her claims of retaliation and negligence.

In addition to detailed findings of fact that related to the general chronology of events, the district court made findings of fact that related specifically to the discriminatory treatment Lentini suffered at the Center on January 13, 1999. Among them, the district court found that Corbin had told Lentini that only seeing-eye dogs were allowed in the theater and that Corbin refused to listen to Lentini's explanation that Jazz was her service dog. The court found that, in both a "House Manager's report" written on January 13, 1999, as well as in conversation with Tina Ostrem, the Assistant Director of Sales, Corbin stated that Lentini was excluded and the police were called because Lentini failed to produce her tickets at the door and the performance was being delayed—never mentioning the fact that Jazz had previously created a disturbance. The

court found that Vogel told Ostrem the same story. The court found Corbin's and Vogel's explanation regarding tickets pretextual, "not to mention untrue." The district court found that Corbin, Vogel, and other staff members had doubts—or simply did not believe—that Jazz was a service animal, and the court found that Corbin's true reason for excluding Lentini was his mistaken belief that Jazz was not a service animal. Moreover, the court found that Corbin used Beer's recommendation to call the police "as an affirmation of his already existing desire to eject Lentini. . . ."

The district court also made a number of findings regarding the effect of admitting service animals on the Center. In this context, the court found that the Center's principle business of generating revenue for the support of its museum, education, outreach and access programs is a "highly laudable purpose." Moreover, it found that diminished revenue due to a loss of patrons or artists would negatively impact the Center's core business. The court found that "yipping" is an acceptable service behavior although, in certain instances, it may be inappropriate. It concluded that "[a] service dog who barks during a performance for an improper or inappropriate reason would disrupt performing artists and likely disturb and disgruntle other patrons. It would also deprive the Center of the advantages it has over other concert halls due to its intimate setting and wonderful acoustics."

The court found that the Center had an unwritten policy "to exclude service animals that have made sounds at prior events regardless of the level of the noise and regardless of whether the animal's noises were made for a legitimate reason,

such as alerting its owner of an oncoming medical emergency or dangerous condition." However, the court found that the Center did not have a similar policy applicable to humans "to exclude a human who made a noise at a prior event for similar reasons or an individual who suffered a medical emergency or condition that caused him or her to make a noise or scene that might have disrupted the performance." The noises Jazz made at the R. Carlos Nakai concert and the Music Man performance were, the court determined, intended to alert Lentini to a possibly dangerous situation.

The district court ordered the Center to modify its policies to give persons with disabilities the "broadest feasible access" to the Center. The focus of this appeal is a portion of the order regarding admittance of service animals:

> The Center's policies, practices and procedures may not exclude a service animal who has made a noise on a previous occasion, even if such behavior is disruptive, if the noise was made and intended to serve as means of communication for the benefit of the disabled owner or if the behavior would otherwise be acceptable to the Center if engaged by humans.

The district court held the appellants jointly and severally liable to Lentini for $7,000, representing the statutory minimum of $1,000 for each of the performances Lentini was deterred from attending as a result of the appellants' discrimination.[4] The district court held Corbin individually liable to Lentini for $5,000, and it held Vogel individually liable to Lentini for $1,000. Although premised at least in part on ADA violations, all of these awards

---

4. The court had found that, between January 13, 1999, the date of the incident, and February 16, 1999, when Lentini received her refund, she was deterred from attending seven performances.

were made pursuant to the Unruh Act.[5] Because it found that the appellants' actions were not willful or malicious, the district court did not award punitive damages.

## STANDARDS OF REVIEW

 Following a bench trial, the judge's findings of fact are reviewed for clear error. *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir.2002). " 'This standard is significantly deferential, and we will accept the lower court's findings of fact unless we are left with the definite and firm conviction that a mistake has been committed.' " *N. Queen Inc. v. Kinnear*, 298 F.3d 1090, 1095 (9th Cir. 2002) (quoting *Allen v. Iranon*, 283 F.3d 1070, 1076 (9th Cir.2002)). The district court's conclusions of law following a bench trial are reviewed *de novo*. *Brown v. United States*, 329 F.3d 664, 671 (9th Cir. 2003). The district court's computation of damages following a bench trial is reviewed for clear error. *Schnabel v. Lui*, 302 F.3d 1023, 1029 (9th Cir.2002).

## ANALYSIS

A. *The Ordered Modification of the Center's Policies*

 The appellants contend that the ordered modification of the Center's policies is unnecessary and unreasonable and will fundamentally alter the services and facilities provided by the Center.[6]

Title III of the ADA establishes that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation...." 42 U.S.C. § 12182(a). "Discrimination" is defined as, among other things, "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities...." 42 U.S.C. § 12182(b)(2)(A)(ii). The Department of Justice has issued regulations stating that, "[g]enerally, a public accommodation shall modify policies, practices, or procedures to permit the use of a service animal by an individual with a disability." [7] 28 C.F.R. § 36.302(c)(1). By this regulation the Department of Justice intended that "the broadest feasible access be provided to service animals in all places of public accommodation ...." 28 C.F.R. Pt. 36, App. B at 697. However, the failure to make such modifications does not constitute discrimination where the entity

---

**5.** *See Wander v. Kaus*, 304 F.3d 856, 858 (9th Cir.2002) ("Damages are not recoverable under Title III of the ADA—only injunctive relief is available for violations of Title III."). The $7,000 award was alternatively premised on the Disabled Persons Act. *See id.;* Cal. Civ. Code § 54.3(a).

**6.** For the first time in their reply brief, the appellants argue directly that the Center did not violate the ADA. They base this argument on the fact that Lentini and Jazz had been admitted to performances prior to January 13, 1999. We decline to consider this argument because the appellee has not been given the opportunity to respond. *See United States v. Rearden*, 349 F.3d 608, 614 n. 2 (9th Cir.

2003) ("We decline to consider Rearden's argument ... because it is raised for the first time in reply."); *Cedano–Viera v. Ashcroft*, 324 F.3d 1062, 1066 n. 5 (9th Cir.2003) ("[W]e decline to consider new issues raised for the first time in a reply brief.").

**7.** When Congress drafted the ADA it "prohibited disability discrimination in general terms, *see* 42 U.S.C. §§ 12182(a) and 12182(b)(2)(A)(iv), and then directed the Attorney General to promulgate regulations implementing the ADA's policies, 42 U.S.C. § 12186(b)." *Save Our Valley v. Sound Transit*, 335 F.3d 932, 958 n. 8 (9th Cir.2003).

"can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations ...." 42 U.S.C. § 12182(b)(2)(A)(ii). The Supreme Court has clarified that "the statute contemplates three inquiries: whether the requested modification is 'reasonable,' whether it is 'necessary' for the disabled individual, and whether it would 'fundamentally alter the nature of' the[goods, services, etc.]." *PGA Tour, Inc. v. Martin,* 532 U.S. 661, 683 n. 38, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001) (quoting 42 U.S.C. § 12182(b)(2)(A)(ii)).

### 1. "Reasonable" and "Necessary"

■ The appellants argue that the ordered modifications are not "reasonable" or "necessary."[8] *See* 42 U.S.C. § 12182(b)(2)(A)(ii). They contend that the Center's prior policies already accommodated individuals with disabilities and that those policies represent the fewest possible restrictions on access of service animals. They further contend that the modifications are not necessary to accommodate Lentini because on January 13 she had a human companion who could have assisted her and because the Center had special ushers available to assist Lentini. We find that the modification is both reasonable and necessary.

#### a. *Reasonable*

"[T]he determination of what constitutes reasonable modification is highly fact-specific, requiring case-by-case inquiry." *Crowder v. Kitagawa,* 81 F.3d 1480, 1486 (9th Cir.1996). Here, there is abundant evidence that the district court weighed the Center's concerns and Lentini's needs. The ordered modification strikes a well-

reasoned and carefully-crafted balance between these two interests—generally allowing access for service animals but providing that they can be excluded under certain circumstances. This is clearly in line with the ADA. *See* 28 C.F.R. Pt. 36, App. B at 697 (Department of Justice statement that it intends that "the broadest feasible access be provided to service animals in all places of public accommodations ....").

The only real issues of reasonableness involve practical concerns relating to the implementation of the modification. The first of these is the requirement that the Center make comparisons between human and animal behavior. The district court ordered that the Center may not exclude service animals that make noise, "if the behavior would otherwise be acceptable to the Center if engaged by humans." The appellants contend that this test is impossible to apply. In this respect, the appellants submitted testimony about the way in which yipping or barking at the same decibel level as a human noise such as coughing would be more disruptive because it is an unexpected sound in a performance space.

Clearly, humans generally do not bark like dogs and dogs generally do not cough like humans. But that does not render the ordered modification unreasonable. The order requires a general comparison of disruptiveness, and this does not seem an especially difficult task. For instance, the acceptability of a given outburst—human or animal—can be gauged by patrons' responses. In this case, no patron complained on the two occasions that Jazz made noise in the Center; it seems clear that Jazz's behavior was not disruptive.

---

8. At oral argument, the appellants arguably waived their claim that the modification is unreasonable. However, because significant portions of their briefs address this issue, we choose to consider it here.

The second practical issue relates to the requirement that the Center's staff determine the "intent" of the service animal. The district court ordered that the Center could not exclude service animals that make noise, "if the noise was made and intended to serve as means of communication for the benefit of the disabled owner. . . ." The record in this case clearly demonstrates that the "intent" of a service animal is something that can be sufficiently discerned by circumstantial evidence. For instance, the district court specifically found that "[t]he sounds emitted by Jazz during the Nakai concert and The Music Man performance were yips meant to alert Lentini of a possibly dangerous situation."

Therefore, we find that neither of these practical concerns renders the modification unreasonable.

b. *"Necessary"*

Similarly, we find that the appellants have failed to demonstrate that the ordered modification is not necessary. Jazz has made noise at performances in the past and would be subject to exclusion under the Center's prior policy. Because of the bond Lentini maintains with Jazz, she does not have the option of separating from Jazz for the duration of a concert. The modification is therefore necessary because, but for the modification, Lentini would effectively be excluded from future performances at the Center. *Cf. Martin v. PGA Tour, Inc.,* 204 F.3d 994, 999 (9th Cir.2000) ("Use of a golf cart is also 'necessary'; there was ample evidence to support the district court's finding that Martin could not walk the course, even with artificial aids."). The fact that Lentini had an able-bodied companion at the January 13 performance does not alter this conclusion; nowhere have the appellants claimed that Lentini must always bring a human companion to the Center's performances in lieu of her service dog. Further, although the Center contends that its staff is specially trained to assist disabled individuals, the record fails to support the conclusion that these specially-trained ushers could and would provide the same assistance to Lentini that Jazz does. Therefore, we find that the ordered modification is necessary.

2. "Fundamental Alteration"

■■■ The appellants also contend that the ordered modification will "fundamentally alter" the nature of the services or facility provided by the Center. Whether an accommodation fundamentally alters a service or facility is an affirmative defense. *See Colo. Cross Disability Coalition v. Hermanson Family Ltd.,* 264 F.3d 999, 1003 (10th Cir.2001) (describing the fundamental alteration component of 42 U.S.C. § 12182(b)(2)(A)(ii) as an affirmative defense); *Johnson v. Gambrinus Co./Spoetzl Brewery,* 116 F.3d 1052, 1059 (5th Cir. 1997) (same). This court has recognized that whether an accommodation causes a fundamental alteration is "an intensively fact-based inquiry." *Martin,* 204 F.3d at 1001.

■■ In this regard, the appellants presented the testimony of John Haynes, the Center's President and Chief Operating Officer. Speaking generally about the effect of a barking dog in the Center's concert hall, Haynes stated that "it may offend and drive away other patrons." Haynes testified that although "people are increasingly accustomed to the presence of service animals in public areas of all kinds," a barking dog will "pierce[ ] through the veil of [patrons'] expectations." Haynes also testified that a barking dog in the concert hall would adversely affect the Center's ability to attract artists. Haynes stated that these problems could cause lost ticket revenue for concert hall events, which could affect the other core

businesses of the Center such as education, museum programs, and outreach programs. Haynes testified specifically that a dog barking would fundamentally alter the service that the Center provides in its concert hall.

However, as described above, the facts of this case provide evidence contrary to Hayne's testimony. Jazz made noises at two performances. At one of the incidents, appellant Vogel believed that he heard a dog bark, but he did not feel a need to stop the disturbance. In fact, he did not even mention the incident to Lentini when he spoke with her after the show. No complaints were made about Jazz's behavior as a result of either incident. This is especially significant because the appellants point to the incidents with Lentini and Jazz as a basis for their concerns regarding the ordered modification. Haynes testified that the Center is not necessarily concerned about (and would not exclude) a random animal but is particularly concerned about Jazz because Jazz had "barked in the concert hall previously." Because the incidents involving Jazz apparently did not cause any significant disturbance, Haynes's use of those incidents as a premise for his argument that the ordered modification would fundamentally alter the services and facility renders his conclusion highly questionable.

At best, Haynes's testimony provides some reasonable speculation about the effect of a barking dog at a performance. This speculation, however, is undercut by evidence that whatever noise Jazz made in the Center, he did not cause a significant disturbance or trigger patron complaints. Moreover, the ordered modification does not completely tie the appellants' hands; instead, it sets forth reasonable limitations on when the Center can exclude a service animal. We affirm the district court in

this regard and find that the appellants have not made out their affirmative defense that the ordered modification would cause a fundamental alteration of the services and facility provided by the Center.

## B. *Damages*

### 1. Intentional Discrimination and the Unruh Act

As a challenge to all of the damages awarded in this case, the appellants claim that the district court's award under the Unruh Act required a showing of intentional discrimination. The district court expressly found that the appellants did not intentionally discriminate against Lentini.[9] But the district court concluded that proof of discriminatory intent was not necessary to award damages under the Unruh Act in this case. Significant in this regard is the fact that the district court found that the appellants violated the ADA.

In 1991, the California Supreme Court declared in *Harris v. Capital Growth Investors XIV,* 52 Cal.3d 1142, 1175, 278 Cal.Rptr. 614, 805 P.2d 873 (1991), that "a plaintiff seeking to establish a case under the Unruh Act must plead and prove intentional discrimination in public accommodations in violation of the terms of the Act." In 1992, the Unruh Act was amended to provide that "[a] violation of the right of any individual under the Americans with Disabilities Act of 1990 ... shall also constitute a violation of this section." Cal. Civ.Code § 51(f); *Presta v. Peninsula Corridor Joint Powers Bd.,* 16 F.Supp.2d 1134, 1135 (N.D.Cal.1998). It is undisputed that a plaintiff need not show intentional discrimination in order to make out a violation of the ADA. *See Martin v. PGA Tour, Inc.,* 994 F.Supp. 1242, 1247–48 (D.Or.1998) ("Congress intended to protect

---

9. Below, however, we find that Corbin did in fact intentionally discriminate against Lentini.

disabled persons not just from intentional discrimination but also from 'thoughtlessness,' 'indifference,' and 'benign neglect.' "), *aff'd by Martin*, 204 F.3d 994; *see also* 42 U.S.C. § 12182(b)(2)(A)(ii); 42 U.S.C. § 12101(a)(5) (a congressional finding that "individuals with disabilities continually encounter various forms of discrimination, including *outright intentional exclusion*, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, *failure to make modifications to existing facilities and practices*, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities ...." (emphasis added)). Therefore the question arises whether, by virtue of the 1992 amendment to the Unruh Act, *Harris's* requirement of intentional discrimination still exists in a suit such as this. Apparently no binding authority addresses this question.

■■■ We find that, regardless of whether *Harris* may continue to have relevance to other Unruh Act suits, no showing of intentional discrimination is required where the Unruh Act violation is premised on an ADA violation. This result is mandated by the plain meaning of the Unruh Act's language, which states that a violation of the ADA is, *per se*, a violation of the Unruh Act. *See Biehl v. C.I.R.*, 351 F.3d 982, 986 (9th Cir.2003) ("Statutory interpretation begins with the plain meaning of the statute's language." (citation and quotation marks omitted)). "Because the Unruh Act has adopted the full expanse of the ADA, it must follow, that the same standards for liability apply under both Acts." *Presta*, 16 F.Supp.2d at 1135. Therefore, we affirm the district court's conclusion that, insofar as the appellants violated the ADA, a showing of intentional discrimination was not required in order to award damages under the Unruh Act.[10]

2. Sufficiency of the Evidence that Lentini Was Deterred From Attending Performances at the Center

■■■ The district court found that, "[b]etween January 13, 1999 and February 16, 1999, Lentini was deterred from attending seven (7) performances at the Center."[11] Under California Civil Code § 52, a court can award actual damages and an amount up to three times the actual damages for a violation of the Unruh Act, "but in no case less than [$1,000]. ..." Cal. Civ.Code § 52(a); *cf. id.*, historical and statutory notes (indicating that in 2001 the statutory minimum was increased from $1,000 to $4,000). Following *Botosan v. Fitzhugh*, 13 F.Supp.2d 1047, 1051–52 (S.D.Cal.1998), which held that this damages provision applies to each incident of deterrence, the district court awarded Lentini $7,000 based on the statutory minimum of $1,000 for each of the performances Lentini was deterred from attending as a result of the appellants' discrimination.[12]

The appellants claim that Lentini failed to present sufficient evidence of deterrence. We disagree. Lentini testified as follows:

10. Given this conclusion, we need not address Lentini's alternative argument that she can recover the relevant damages under the Disabled Persons Act without a showing of intentional discrimination.

11. The court noted that ten performances took place during this time period but that there were certain repeat performances. The court found that Lentini would have attended only one of each of the repeated performances.

12. The appellants do not dispute the premise that this damages provision applies to each incident of deterrence.

Q. But for this incident, you would have gone back to the Center?

A. I would have gone back if it had not been for this incident. I had almost bought season tickets for that year.

Q. Is that because you had read a program and determined that there were—a flier and determined that there were programs that you wanted to attend?

A. They send out seasonal brochures listing everything that's coming up for the season.

Q. Did you see in that brochure any event that you wanted to go to that would take place after January 13, 1999, that you missed because of this incident?

A. Absolutely.

Q. How many[?]

 . . .

A. There are at least ten. . . .

Q. So, based on what you saw in the promotional brochure, you determined that there were ten events that you would have gone to after "Tango Buenos Aires", but for the incident that is the subject of this case; is that correct?

 . . .

[A.] Absolutely.

The appellants, however, attempt to ascribe Lentini's non-attendance at Center events to other causes. They contend that Lentini failed to attend performances at La Jolla Playhouse and the Old Globe Theatre after January 13, 1999, because of health problems unrelated to the incident at the Center. The appellants have failed to provide the transcript pages they rely on in support of this argument. A review of the relevant testimony indicates that Lentini provided a very plausible alternative explanation for not attending perform-

ances at La Jolla Playhouse and the Old Globe Theatre at that time. She testified:

Q. You testified that you haven't been back to the Center for the Arts since the date of the incident. Have you been to any other performing arts centers?

A. No.

Q. Why not?

A. I haven't had the health and the body to get to La Jolla Playhouse or the Old Globe safely.

Lentini later provided more detail as to why she did not attend performances at those other theaters:

Q. And I believe you also testified that your condition has been such since January 13, 1999, that you also have been unable to attend performances at some of the other theaters you mentioned; is that correct?

A. La Jolla Playhouse, Old Globe, because those are evening performances. The night driving is very difficult. At that time, it was.

Q. So you hadn't attended performances at those other locations since January 13, 1999, correct?

A. That's right, because I live in Escondido now. I used to live down in the San Diego area, close to them.

On the basis of this testimony (and in the absence of testimony that contradicts Lentini's), we affirm the district court's finding that Lentini was deterred from attending seven performances. Lentini testified consistently with this finding, and she provided a reasonable alternative explanation for her failure to attend events at other theaters during that time. Following a bench trial, the judge's findings of fact are reviewed for clear error. *Zivkovic*, 302 F.3d at 1088. " 'This standard is significantly deferential, and we will accept the lower court's findings of fact unless we

are left with the definite and firm conviction that a mistake has been committed.'" *N. Queen Inc.*, 298 F.3d at 1095 (quoting *Allen*, 283 F.3d at 1076). We find that the appellants have failed to demonstrate that the district court's findings of fact in this respect were clearly erroneous.

### 3. Vogel's Individual Liability

The district court found Vogel individually liable to Lentini in the amount of $1,000 "based on his individual liability under the ADA as incorporated by the Unruh Act." The appellants contend that this holding was erroneous.

Title III of the ADA prohibits discrimination "by any person who *owns, leases* (or leases to), or *operates* a place of public accommodation." 42 U.S.C. § 12182(a) (emphasis added); *see also PGA Tour, Inc. v. Martin*, 532 U.S. at 676–77, 121 S.Ct. 1879. The district court found both Corbin and Vogel liable under the ADA as "operators" of a place of public accommodation.

 We agree with the Fifth Circuit's guidelines for defining the scope of the verb "to operate" in this context. *See Neff v. Am. Dairy Queen Corp.*, 58 F.3d 1063, 1066 (5th Cir.1995). Specifically, "to operate" means "to put or keep in operation," "to control or direct the functioning of," or "to conduct the affairs of; manage." *See id.; see also Coddington v. Adelphi Univ.*, 45 F.Supp.2d 211, 217 (E.D.N.Y.1999) (stating that the relevant standard is whether the individual "ha[d] the power to facilitate any necessary accommodation."); *Aikins v. St. Helena Hosp.*, 843 F.Supp. 1329, 1335 (N.D.Cal. 1994) (stating that the operator requirement "retains accountability *for those in a position to ensure nondiscrimination.*" (emphasis added)). Employing these guidelines, we find that Vogel, who was the Director of Center Sales and Event Services, had the requisite authority to qualify as an "operator" under Title III. As the district court found, he "was in a position of authority, having the ability to instruct the Center staff on who could or could not be admitted to the theater."

Further, the district court's factual findings indicate that the Vogel, in this position of authority, actively participated in the discriminatory acts. The district court found that

> After hearing Jazz make a noise during the Nakai concert and without inquiring into why the dog may have barked or yipped, Vogel directed the staff not let Lentini back in with her dog. While the Center had a policy that certain service animals were to be admitted to the theater, there was no policy to exclude animals who may have previously made a noise in the theater.

The district court also found that Vogel, like Corbin, lied to the Assistant Director of Sales, claiming that Lentini had been ejected because she did not present her tickets at the door. These findings demonstrate the critical role that Vogel played in the discrimination; the fact that he was not at the Center on January 13 does not preclude liability. Therefore, we affirm the district court's conclusion that Vogel is liable under the ADA, and we affirm the associated award of damages under the Unruh Act.

### 4. Corbin's Individual Liability

 The district court found Corbin individually liable to Lentini in the amount of $5,000 "based on his individual liability under the ADA as incorporated by the Unruh Act." The appellants contend that this holding was erroneous.

We decline to address whether Corbin is liable as an "operator" under the ADA because the record establishes that Corbin intentionally discriminated against Lentini

in violation of the Unruh Act. *See Atel Fin. Corp. v. Quaker Coal Co.*, 321 F.3d 924, 926 (9th Cir.2003) ("We may affirm a district court's judgment on any ground supported by the record, whether or not the decision of the district court relied on the same grounds or reasoning we adopt."). The district court found that "Corbin's actions to eject Lentini were a result of his ignorance of applicable ADA policy and personal animus." He was the primary actor in the discriminatory acts, going so far as to call the police and threaten to have Lentini arrested. In what can only reasonably be understood to be an attempt to conceal the discrimination, Corbin lied in his House Manager's report for January 13 and to the Assistant Director of Sales, claiming that Lentini was excluded and the police were called because Lentini failed to produce her tickets. Corbin's acts, labeled "irrational and unprofessional" by the district court, evince a clear intent to discriminate against Lentini on the basis of her disability.[13] We therefore find that Corbin violated the Unruh Act. *See* Cal. Civ.Code § 51(a) ("All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, *disability,* or medical condition are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." (emphasis added)); Cal. Civ.Code § 52(a) ("Whoever denies, aids or incites a denial, or makes any discrimination or distinction contrary to Section 51 ... is liable...").

The appellants contend that, in any event, Lentini failed to prove that Corbin's actions caused her any physical or emotional injuries. We disagree. As not-

ed above, the district court's computation of damages following a bench trial is reviewed for clear error. *Schnabel,* 302 F.3d at 1029. "If the district court's conclusion is 'plausible in light of the record viewed in its entirety' then it is not clearly erroneous." *Simeonoff v. Hiner,* 249 F.3d 883, 893 (9th Cir.2001) (quoting *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). "We will not disturb an award of damages unless it is clearly unsupported by the evidence, or it shocks the conscience." *Simeonoff,* 249 F.3d at 893 (citation and quotation marks omitted).

The district court found that, "[i]mmediately after the incident [on January 13], Lentini suffered from severe body shakes, which created difficulty in her steering her wheelchair. She required the assistance of her companion, Richard Maciel before she was able to drive safely home." As noted above, the district court found that Lentini was deterred from attending performances at the Center. The court also found that Corbin "threatened and intimidated Lentini by signing a citizen's arrest form...." Lentini testified that she suffered severe shakes for about one week after January 13, 1999, and less severe shakes for a significant period of time after that. She testified that she suffered degradation, embarrassment, humiliation, and trauma as a result of the events of January 13. The individual who accompanied Lentini testified that she remained unusually tense for at least two weeks after the incident.

The appellants contend that some of Lentini's alleged suffering may have been due to causes other than the January 13 incident. However, at trial Lentini differentiated between the physical symptoms she has experienced as a result of the

---

13. We recognize that the district court expressly found that the appellants, as a group, did not intentionally discriminate against

Lentini. But given the detailed factual findings regarding Corbin's conduct, we reject this conclusion as to him.

January 13 incident and other traumatic incidents that apparently occurred during the relevant time period. She also testified to differences between the suffering she experienced as a result of the January 13 incident and the cancer that she apparently has.

Under the deferential standard applied to the award of damages, *see Simeonoff,* 249 F.3d at 893, we find that the award of $5,000 against Corbin is adequately supported.[14]

## CONCLUSION

We affirm the district court's judgment in all respects.

AFFIRMED.

---

**14.** This conclusion is buttressed by the fact that, under the Unruh Act, the court can award an additional amount up to three times the amount of actual damages. *See* Cal. Civ. Code § 52(a).