THOMAS, Chief Judge,
concurring in part and dissenting in part:
I largely agree with all but one of the majority’s conclusions.[1] I respectfully disagree with the majority’s conclusion that the district court clearly erred in ordering the NCAA to permit up to $5,000 in deferred compensation above student-athletes’ full cost of attendance.
I
We review the district court’s determinations of fact for clear error. We are not permitted to “review the evidence de novo *1080 and freely substitute our judgment for that of the trial judge.” United States v. Ironworkers Local 86, 443 F.2d 544, 549 (9th Cir.1971). Rather, the clear error standard “is significantly deferential, and we will accept the lower court’s findings of fact unless we are left with the definite and firm conviction that a mistake has been committed.” Lentini v. Cal. Ctr. for the Arts, Escondido, 370 F.3d 837, 848-49 (9th Cir.2004).
There was sufficient evidence in the record to support the award. The district court’s conclusion that the proposed alternative restraint satisfied the Rule of Reason was based on testimony from at least four experts-including three experts presented by the NCAA-that providing student-athletes with small amounts of compensation above their cost of attendance most likely would not have a significant impact on consumer interest in college sports. O’Bannon, 7 F.Supp.3d at 976-77, 983-84, 1000-01. It was also based on the fact that FBS football players are currently permitted to accept Pell grants in excess of their cost of attendance, and the fact that Division I tennis recruits are permitted to earn up to $10,000 per year in prize money from athletic events before they enroll in college. Id. at 974, 1000. The majority characterizes the weight of this evidence as “threadbare.” Op. at 1077. I respectfully disagree.
The NCAA’s own expert witness, Neal Pilson, testified that the level of deferred compensation would have an effect on consumer demand for college athletics, but that paying student-athletes $5,000 per year in trust most likely wpuld not have a significant impact on such demand. He also testified that any negative impact that paying student-athletes might have on consumer demand could be partially mitigated by placing the compensation in a trust fund to be paid out after graduation.
The majority dismisses this testimony because it was made in a very “offhand” manner, and because Pilson proffered the $5,000 amount on cross-examination “[wjhen pressed.” Op. at 1078. However, the NCAA presented this witness as an expert on the issue of whether paying college athletes will negatively impact consumer demand for college sports.[2] Pilson testified at length on the topic, and his qualifications were not challenged. It is not appropriate for us on appeal to assess demeanor we did not see. As a result, I would take the testimony at face value, and the district court did not clearly err in crediting it.
*1081 The majority also dismisses the testimony given by expert witness Dr. Daniel Rascher demonstrating that consumer interest in major league baseball and the Olympics increased after baseball players’ salaries rose and professional athletes were allowed to compete in the Olympics. The majority reasons that major league baseball and the Olympics are “not fit analogues to college sports,” speculating that college sports would be more significantly transformed by professionalism than have the Olympics. Op. at 1077. However, the majority does not offer any evidentiary support for the distinction, nor explain how or why the district court clearly erred in crediting this testimony.
Moreover, Rascher also testified that consumer demand in sports such as tennis and rugby increased after the sports’ governing boards permitted athletes to receive payment. O’Bannon, 7 F.Supp.3d at 977. In my view, the majority errs in dismissing this testimony. The import of Rascher’s testimony was that consumer demand typically does not decrease when athletes are permitted to receive payment, and that this general principle holds true across a wide variety of sports and competitive formats. The district court did not clearly err in crediting it.
The district court accepted the testimony of multiple experts that small amounts of compensation would not affect consumer demand, and then used the lowest amount suggested by one of the NCAA’s experts. The district court was within its right to do so.[3]
II
The disagreement between my view and the majority view largely boils down to a difference in opinion as to the procompeti-tive interests at stake. The majority characterizes our task at step three of the Rule of Reason as determining “whether the alternative of allowing students to be paid NIL compensation unrelated to their education expenses is ‘virtually as effective’ in preserving amateurism as not allowing compensation.” Op. at 1076 (emphasis added). This conclusion misstates our inquiry. Rather, we must determine whether allowing student-athletes to be compensated for their NILs is ‘virtually as effective’ in preserving popular demand for college sports as not allowing compensation. In terms of antitrust analysis, the concept of amateurism is relevant only insofar as it relates to consumer interest.
The district court found that there are two, limited procompetitive benefits to the current rule. It found that limits on large amounts of student-athlete compensation preserve the popularity of the NCAA’s product, and that limits on large amounts of student-athlete compensation promote the integration of academics and athletics. O’Bannon, 7 F.Supp.3d at 1004-05. In reaching these conclusions, the district court explained:
*1082 [S]ome restrictions on compensation may still serve a limited procompetitive purpose if they are necessary to maintain the popularity of FBS football and Division I basketball. If the challenged restraints actually play a substantial role in maximizing consumer demand for the NCAA’s product — specifically, FBS football and Division I basketball telecasts, re-broadcasts, ticket sales, and merchandise — then the restrictions would -be pro-competitive. Id. at 1000 (emphasis added).
The district court recounted the testimony of NCAA expert witness Dr. J. Michael Dennis, who conducted a survey of consumer attitudes concerning college sports in 2013. .The court found that “[w]hat Dr. Dennis’s survey does suggest is that the public’s attitudes toward student-athlete compensation depend heavily on the level of compensation that student-athletes would receive.” Id. at 1000-01. It noted that this conclusion “is consistent with the testimony of the NCAA’s own witnesses, including [Stanford athletic director Bernard] Muir and Mr. Pilson, who both indicated that smaller payments to student-athletes would bother them less than larger payments.” Id. at 1001.
The district court determined that “the evidence presented at trial suggests that consumer demand for FBS football and Division I basketball-related products is not driven by the restrictions on student-athlete compensation but instead by other factors, such as school loyalty and geography.” Id. The court therefore concluded that:
the NCAA’s restrictions on student-athlete compensation play a limited role in driving consumer demand for FBS football and Division I basketball-related products. Although they might justify a restriction on large payments to student-athletes while in school, they do not justify the rigid prohibition on compensating student-athletes, in the present or in the future, with any share of licensing revenue generated from the use of their names, images, and likenesses.

Id.

The district court’s findings of fact provide that one procompetitive benefit of the current rule is that restricting large payments to student-athletes plays a limited role in preserving the popularity of the NCAA’s products. In the context of this antitrust suit, the concept of “amateurism” is useful only to the extent that it furthers this goal. In terms of antitrust analysis, amateurism is relevant only insofar as popular demand for college sports is increased by consumer perceptions of and desire for amateurism. Viewed through the antitrust lens, it is consumer desire that we must credit; not the NCAA’s preferred articulation of the term.[4]
*1083 Plaintiffs are not required, as the majority suggests, to show that the proposed alternatives are “virtually as effective” at preserving the concept of amateurism as the NCAA chooses to define it. Indeed, this would be a difficult task, given that “amateurism” has proven a nebulous concept prone to ever-changing definition. See O’Bannon, 7 F.Supp.3d at 973-75 (describing the ways that the NCAA’s definition of amateurism has changed over time). Even today, the NCAA’s conception of amateurism does not fall easily into a bright line rule between paying student-athletes and not paying them. Tennis players are permitted to receive payment of up to $10,000 per year for playing their sport. A tennis player who begins competing at a young age could presumably earn upwards of $50,000 for playing his sport and still be considered an amateur athlete by the NCAA.[5]
The NCAA insists that consumers will flee if student-athletes are paid even a small sum of money for colleges’ use of their NILs. This assertion is contradicted by the district court record and by the NCAA’s own rules regarding amateurism. The district court was well within its right to reject it. Division I schools have spent $5 billion on athletic facilities over the past 15 years. The NCAA sold the television rights to broadcast the NCAA men’s basketball championship tournament for 12 years to CBS for $10.8 billion dollars. The NCAA insists that this multi-billion dollar industry would be lost if the teenagers and young adults who play for these college teams earn one dollar above their cost of school attendance. That is a difficult argument to swallow. Given the trial evidence, the district court was well within its rights to reject it.
Ill
The national debate about amateurism in college sports is important. But our task as appellate judges is not to resolve it. Nor could we. Our task is simply to review the district court judgment through the appropriate lens of antitrust law and under the appropriate standard of reyiew. In the end, my disagreement with the majority is founded on the appropriate standard of review. After an extensive bench trial, the district court made a factual finding that payment of $5,000 in deferred compensation would not significantly reduce consumer demand for college sports. This finding was supported by extensive testimony from at least four expert witnesses. There was no evidence to the contrary. Therefore, on this record, I cannot agree with the majority that the district court clearly erred when it determined that paying student-athletes up to $5,000 per year would be “virtually as effective” at preserving the pro-competitive benefits of the current rule. Therefore, I would affirm the district court in all respects.
*1084 For these reasons, I concur in part and dissent in part.

. The majority concludes that the plaintiffs established antitrust injury in fact because the NCAA has foreclosed them from the market for the athletes’ names, images, and likenesses ("NILs”) in video games. Because we are bound by In re NCAA Student-Athlete Name & Likeness Licensing Litig. (“Keller'’), 724 F.3d 1268 (9th Cir.2013), a case in which I dissented, I agree that the plaintiffs have sufficiently established antitrust injury. However, absent Keller, there is a serious question as to whether the plaintiffs have established the requisite antitrust injury in fact.

. Pilson’s testimony included the following exchanges:
Q: Okay. And let me just turn finally to your last opinion just briefly, Mr. Pilson, regarding whether paying basketball and football players in college threatens the popularity of college sports with the television audience. Just briefly sir, over the course of your career in the sports broadcast industry, have you come to have opinions about why viewers are interested in college sports on television?
A: Yes, I have.
Q: And how did you come to have those opinions?
A: I [sic] been in the industry for 40 years. I’ve acquired and telecast thousands of hours of college sports. I watch college sports and evaluate them, so I have a pretty good handle on the industry. Of course, I have personal opinions as well, but I certainly — I’ve worked in the industry a long time.
Q: Okay. Now, your opinions about why this would be damaging to the sport are based on your — what you think viewers appreciate, what the public perceives. I have that correct?
A: Yes. And I would suggest I've been in that business measuring viewers- — my whole job at CBS over 20 years was to try to figure out what the viewers wanted to watch and give it to them, so I'm not a layman on that subject.

. The majority states that it "cannot agree that a rule permitting schools to pay students pure cash compensation and a rule forbidding them from paying NIL compensation are both equally effective in promoting amateurism and preserving consumer demand.” Op. at 1076. And yet the majority cites no record evidence to support its conclusion that paying student-athletes $5,000 in deferred compensation will significantly reduce consumer demand. Rather, the majority declares that it is a "self-evident fact” that "[t]he difference between offering student-athletes education-related compensation and offering them cash sums untethered to educational expenses is not minor; it is a quantum leap.” Op. at 1077, 1078. To the contrary, the district court concluded after a full bench trial that the distinction between offering student-athletes no compensation and offering them a small amount of compensation is so minor that it most likely will not impact consumer demand in any meaningful way. See O’Ban-non, 7 F.Supp.3d at 976-77, 983-84, 1000-01.

. The majority argues that "[h]aving found amateurism is integral to the NCAA's market, the district court cannot plausibly conclude that being a poorly-paid professional athlete is 'virtually as effective’ for that market as being an amateur. Or, to borrow the Supreme Court's analogy, the market for college football is distinct from other sports markets and must be ‘differentiate[d]' from professional sports lest it become 'minor league [football].' " Op. at 1076-77. The district court found that amateurism played a limited role in preserving the popularity of college sports, and that other factors, such as school loyalty, served as the primaiy force driving interest in college athletics. O’Bannon, 7 F.Supp.3d at 1000. But I agree that an antitrust court should not eliminate the distinction between professional and college sports; to do so would undermine competition. However, in terms of antitrust analysis, the distinction between amateur and professional sports is not for the court to delineate. It is a line for consumers to draw. If consumers believe that paying college football players $5,000 to be held in trust for use of their NILs will convert college football into professional football, and as a consequence they stop watching college football, then the proposed alternative *1083 will not be virtually as effective as the current rule. But, taken to its literal extreme to prohibit even small, deferred payments, the idea that “if you're paid for performance, you’re not an amateur,” Op. at 1076 n. 20, does not reflect consumer behavior. The district court made factual findings that modest payments, including those held in trust, would not significantly affect consumer demand. See O'Bannon, 7 F.Supp.3d at 976-77, 983-84, 1000-01. Therefore, I cannot conclude that the district court clearly erred.

. The majority states that “in finding that paying students cash compensation would promote amateurism as effectively as not paying them, the district court ignored that not paying student-athletes is precisely what makes them amateurs." Op. at 1076. This is not true even under the NCAA’s current definition of the term. But more importantly, we are not tasked with deciding what makes an amateur an amateur. We are tasked with 'determining whether a proposed less-restrictive alternative restraint will affect consumer demand.