134 P.3d 1188 (2006)
132 Wash.App. 903
In re CORPORATE DISSOLUTION OF OCEAN SHORES PARK, INC., a Washington Corporation, and James R. Jordan and Virginia E. Jordan, Appellants,
v.
Gloria RAWSON-SWEET, Respondent.
No. 32789-9-II.
Court of Appeals of Washington, Division 2.
May 16, 2006.
*1189 Jon Emmett Cushman, Attorney at Law, John Michael Morgan, J Michael Morgan PLLC, Olympia, WA, for Appellant.
Dianne Kathleen Conway, Attorney at Law Tacoma, WA, for Respondent.
PENOYAR, J.
¶ 1 James and Virginia Jordan deeded real property to a corporation. When their attorney, John Sweet, issued shares for this corporation, he issued 50 percent of the shares to himself and his wife, and the other 50 percent to the Jordans. The Jordans *1190 later sued Sweet's widow, Gloria Rawson-Sweet, attempting to void the land transfer to the company and dissolve the corporation. The trial court granted Rawson-Sweet's motion for summary judgment and the Jordans appeal. We reverse, holding that the issuance of shares is void as against public policy if Sweet violated the rules of professional conduct by failing to give adequate advice and consideration. We remand for a determination of whether Rawson-Sweet can produce sufficient evidence on these issues to avoid summary judgment in favor of the Jordans.

FACTS

I. BACKGROUND
¶ 2 In approximately 1955, James (Jim) and Virginia Jordan retained John Sweet as their attorney. At the time, the Jordans owned their own company, A & J Utility Contractors. They never consulted any other attorney and used Sweet's services in all construction related disputes, selling their house, and in drafting their wills.
¶ 3 In 1975, the Jordans purchased an eleven acre parcel of property in Ocean Shores for $110,000. They wanted to develop the property, but they could not obtain financing. Sweet said he could probably arrange financing but to do so the Jordans would have to transfer ownership of the real property to a corporation. The Jordans and Sweet, who was not married at the time, agreed to be joint owners of the corporation.
¶ 4 According to Jim Jordan's declaration:
John Sweet represented to me that he would be the attorney and registered agent for corporation [sic]. He also stated that he had to be President of the Corporation in order to obtain financing. I agreed that he could serve in these roles. John Sweet also requested that all invoices and correspondence for the corporation be sent to his Law Office. This was so he could assure potential financiers that there were no liens on the property. When a bill was sent to John Sweet's office on behalf of the Corporation he would forward that bill to me for payment. I paid these bills out of my own personal funds.
Clerk's Papers (CP) at 236.
¶ 5 The Jordans' understanding was that A & J Contractors would be hired to perform the construction services for the development. After development, the property would be sold, and the Jordans would be reimbursed the property's purchase price and all amounts they had invested. The net remaining amount would be divided equally between the Jordans and Sweet. According to the Jordans, Sweet never referred them to another attorney to obtain independent legal advice nor was this agreement ever put into writing.
¶ 6 On February 8, 1983, the Jordans executed the deed conveying the property to a corporation named Ocean Shores Park, Inc. (OSPI). Sweet told the Jordans that he had arranged financing but that it fell through a short while later. The Jordans continued to use Sweet as their attorney and considered him a co-owner of OSPI.
¶ 7 Almost 10 years later, on February 5, 1993, Sweet filed the articles of incorporation for OSPI with the Secretary of State. These listed Sweet and Jordan as the corporate directors.
¶ 8 On January 12, 1994, Sweet signed a stipulation for resignation from the Washington State Bar after disciplinary proceedings for misconduct involving other clients. As part of this stipulation, Sweet agreed he "[would] accept no new clients and [would] not initiate new matters for existing clients." CP at 20. He also agreed to conclude all existing matters and "give written notice to any remain [sic] clients of his pending resignation." CP at 20. Sweet never told the Jordans about this effective disbarment and he continued to represent OSPI in new matters.
¶ 9 On March 9, 1994, Sweet sent the Jordans a certificate for 300 shares of OSPI stock. In the letter accompanying the certificate, Sweet said he had issued another certificate for 300 shares to himself and his wife, Gloria Rawson-Sweet. That certificate lists Sweet and Rawson-Sweet as owners "jointly with right of survivorship." CP at 240. *1191 Sweet was killed in an automobile accident in December 1994.
¶ 10 After Sweet's death, the Jordans and Rawson-Sweet operated OSPI jointly for a number of years. They split responsibility for payment of property taxes and for litigation expenses when the city of Ocean Shores sued OSPI in 1997. After Rawson-Sweet moved to California in 1999, the relationship between her and the Jordans disintegrated.
¶ 11 The parties considered an arrangement whereby Rawson-Sweet would sell her shares to the Jordans. In the end, the Jordans initiated the current action to dissolve OSPI and recover the real property they transferred to the company. This real property is OSPI's only asset and is currently valued at about $830,000.
¶ 12 The Jordans first became aware after filing this suit that Sweet had lost his license to practice law. They also learned for the first time that OSPI's articles of incorporation were not filed until 1993, 10 years after they deeded the property.

II. PROCEDURAL HISTORY
¶ 13 The Jordans filed a motion for partial summary judgment, claiming that their 1983 transfer of the real property to OSPI should be voided because Sweet breached his professional obligations and because the corporation was not formed until 10 years after the transfer. Rawson-Sweet cross motioned for summary judgment, claiming that the statute of limitations had run and that the deadman's statute and the hearsay rules prevented testimony about the agreement between Sweet and the Jordans. The trial court granted Rawson-Sweet's motion and the Jordans now appeal.

ANALYSIS

I. STANDARD OF REVIEW
¶ 14 Summary judgment is appropriate when there are no issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). We review summary judgment orders de novo and perform the same inquiry as the trial court. Owen v. Burlington N. & Santa Fe R.R., 153 Wash.2d 780, 787, 108 P.3d 1220 (2005). We assume facts and reasonable inferences most favorable to the nonmoving party. Owen, 153 Wash.2d at 787, 108 P.3d 1220 (citing Ruff v. King County, 125 Wash.2d 697, 703, 887 P.2d 886 (1995)). The moving party bears the burden of showing there are no material facts in dispute. Malnar v. Carlson, 128 Wash.2d 521, 535, 910 P.2d 455 (1996).

II. ISSUANCE OF SHARES TO THE SWEETS
¶ 15 The Jordans argue that business dealings between an attorney and his client that are advantageous to the attorney are prima facie fraudulent. In re the Disciplinary Proceeding Against McMullen, 127 Wash.2d 150, 168, 896 P.2d 1281 (1995). They claim that documentary evidence of the transaction itself is all they need to show to make their case. Because Rawson-Sweet does not explain or rebut their claim, the Jordans say we must hold that Sweet committed fraud.
¶ 16 The Jordans also claim that the agreement through which the Sweets obtained their 50 percent interest is void because Sweet violated the rules of professional conduct (RPC), and agreements that violate the RPC are void as contrary to public policy.
¶ 17 The Jordans are correct that agreements violating the RPC are contrary to public policy. Danzig v. Danzig, 79 Wash. App. 612, 617, 904 P.2d 312 (1995). Courts generally do not enforce contracts that are contrary to public policy. Danzig, 79 Wash. App. at 616, 904 P.2d 312; see Marshall v. Higginson, 62 Wash.App. 212, 217-18, 813 P.2d 1275 (1991) (refusing to enforce a contract between an attorney and a former client on public policy grounds).
¶ 18 An attorney must show that any business dealings with clients are fair and ethical.
The relation of attorney and client has always been regarded as one of special trust and confidence. The law therefore requires that all dealings between an attorney and his client shall be characterized by the utmost fairness and good faith, and it scrutinizes with great closeness all transactions had between them. So strict is the *1192 rule on this subject that dealings between an attorney and his client are held, as against the attorney, to be prima facie fraudulent, and to sustain a transaction of advantage to himself with his client the attorney has the burden of showing not only that he used no undue influence but that he gave his client all the information and advice which it would have been his duty to give if he himself had not been interested, and that the transaction was as beneficial to the client as it would have been had the client dealt with a stranger.
Transcontinental Ins. Co. v. Faler, 9 Wash. App. 610, 612, 513 P.2d 864 (1973) (citing In re the Proceedings for the Disbarment of Beakley, 6 Wash.2d 410, 423-24, 107 P.2d 1097 (1940)).
¶ 19 This duty of fairness to the client exists in both the current RPC, which were in effect when Sweet issued OSPI shares to himself, and in the Disciplinary Rules for Attorneys (DR), which were in effect when the Jordans signed the deed in 1983. RPC 1.8(a), (c);[1] DR 5-101(A);[2] DR5-104(A);[3]see also Faler, 9 Wash.App. at 612, 513 P.2d 864 (citing Canon of Professional Ethics 11).[4] These rules demonstrate that business transactions between an attorney and a client are highly suspect but are not automatically void. See RPC 1.8; DR5-101(A); DR5-104(A).
¶ 20 To justify a transaction between an attorney and his client, the attorney has the burden to prove: (1) there was no undue influence, (2) he gave the client exactly the same information or advice as would have been given by a disinterested attorney, and (3) the client would have received no greater benefit had he dealt with a stranger. In re the Discipline Proceedings Against Miller, 149 Wash.2d 262, 279, 66 P.3d 1069 (2003) (citing McMullen, 127 Wash.2d at 164, 896 P.2d 1281); See RPC 1.8(a); DR 5-101(A). To meet this burden of proof, the attorney is responsible for documenting the transaction and preserving this documentation to protect himself in the future. See In re the Discipline Proceedings Against Gillingham, 126 Wash.2d 454, 462-63, 896 P.2d 656 (1995).
¶ 21 Here, the suspect transaction was the issuing of half of OSPI's outstanding shares to the Sweets. Through this transaction, the Sweets obtained a one-half interest in real property that had previously belonged solely to the Jordans. The exact agreement between the Jordans and Sweet, and what Sweet may or may not have said to induce the Jordans to enter this transaction, is not reflected in the record except by Jim Jordan's own statements. The parties do agree that the issuance of shares took place.
¶ 22 The evidence we have shows the Sweets received a 50 percent ownership in real property for which the Jordans had paid $110,000. We have no evidence of the Sweet's consideration for this 50 percent. The law simply does not allow an attorney to obtain such a substantial benefit from a client *1193 unless the attorney gave the client proper advice and adequate consideration in return. RPC 1.8; see Holmes v. Loveless, 122 Wash. App. 470, 481, 94 P.3d 338 (2004); Cotton v. Kronenberg, 111 Wash.App. 258, 270-71, 44 P.3d 878 (2002). Where the attorney failed to document that the client received any consideration, we will presume that inadequate consideration was given.[5]See Gillingham, 126 Wash.2d at 462-63, 896 P.2d 656 (emphasizing the importance of documenting client transactions).
¶ 23 Therefore, on the record we have, the issuance of OSPI shares to the Sweets appears to be void as against public policy because it violated the attorney ethical rules against self-dealing. Though we have no evidence that Rawson-Sweet was guilty of any wrongdoing, she was still a party to the transaction in that she received her interest in OSPI when Sweet issued the shares. See RCW 23B.01.400(28), (29). She now claims the benefit of that transaction and so it becomes her burden at summary judgment to produce evidence sufficient to support a finding that this apparently void transaction was supported by adequate advice and consideration.

III. STATUTE OF LIMITATIONS
¶ 24 Rawson-Sweet claims that the statute of limitations bars the Jordans' attempts to void any transaction. If Sweet failed in his ethical or professional duties, Rawson-Sweet says the Jordans should have asserted a malpractice claim directly against Sweet, not against her. She says a malpractice claim is now barred by the three year statute of limitations.
¶ 25 The statute of limitations does not apply where an act or instrument is void at its inception. Colman v. Colman, 25 Wash.2d 606, 611, 171 P.2d 691 (1946); See Marley v. Dep't of Labor & Indus., 125 Wash.2d 533, 538, 886 P.2d 189 (1994). The issuance of corporate shares to the Sweets is void as a matter of public policy if Sweet behaved unethically toward his clients. See Danzig, 79 Wash.App. at 616-17, 904 P.2d 312. Therefore, the statute of limitations does not necessarily bar the Jordan's claims.
¶ 26 Furthermore, even if we characterize this as an attorney malpractice claim, the statute of limitations for an attorney malpractice claim begins to run when the clients discovered the malpractice, not necessarily when the attorney committed it. French v. Gabriel, 116 Wash.2d 584, 595, 806 P.2d 1234 (1991). Here, the Jordans sued upon discovering the significance of Sweet's actions. It begs the question to say that the Jordans should have discovered sooner the significance of the Sweets owning 50 percent of OSPI's shares. The Jordans needed Sweet's professional services because they did not fully understand corporate financing and the significance of corporate shares. To understand the shares' true significance, they needed to consult an attorney. Clients should not have to hire a second attorney each time they receive legal services to ensure that the first attorney treated them fairly.
¶ 27 An attorney who fails in his ethical and professional duties may not reap any benefits from his clients' ignorance. When the Jordans finally discovered the significance of the Sweets being 50 percent shareholders, they sued to recover their land. We will not punish the Jordans because they needed and relied on an attorney. Rather, we will presume the shares were issued wrongfully unless the Sweets can document the consideration they gave. See Sparkman & McLean Co. v. Derber, 4 Wash.App. 341, 350, 481 P.2d 585 (1971) (transfer of money from an insolvent corporation to its attorney should be treated differently because of the intimate nature of the attorney/client relationship).
¶ 28 Placing this high burden on attorneys and those family members and associates who directly benefit from a transaction is necessary because of the suspect nature of attorney/client business transactions. RPC 1.8(a), (c). Rawson-Sweet, as a family member who directly benefited when the transaction occurred, is a proper party to this lawsuit.

*1194 IV. VALIDITY OF THE LAND TRANSFER
¶ 29 The Jordans also claim that they intended to pass title immediately to OSPI when they executed the deed in 1983. Because OSPI did not yet exist, they claim the transfer was not fulfilled and their intent to transfer "died in utero and the conveyance died along with it." Br. of Appellant at 10. For this reason, the Jordans claim that their original transfer to OSPI was invalid. They claim that the trial court erred in not granting them summary judgment on this issue.
¶ 30 A deed to a corporation made before its organization is valid between the parties but is void when asserted against third parties. John Davis & Co. v. Cedar Glen # Four, Inc., 75 Wash.2d 214, 220, 450 P.2d 166 (1969); Cmty. Credit Union Serv., Inc. v. Federal Express Serv. Corp., 534 A.2d 331, 334 (1987). Title passes when the corporation is legally incorporated. John Davis, 75 Wash.2d at 220-21, 450 P.2d 166; Cmty. Credit, 534 A.2d at 334. Delivery of the deed, along with the grantor's intent to deliver, is still necessary for the deed to be operative. In re the Estate of O'Brien, 109 Wash.2d 913, 918, 749 P.2d 154 (1988); Puckett v. Puckett, 29 Wash.2d 15, 18, 185 P.2d 131 (1947).
¶ 31 Here, the Jordans are incorrect in saying that the intent to transfer is a "now or never" proposition. See O'Brien, 109 Wash.2d at 919, 749 P.2d 154 (holding that a deed was valid when the grantor intended it to take effect upon her death). Passage of time does not necessarily void a conveyance as long as the grantor still intended to make the transfer. See O'Brien, 109 Wash.2d at 919, 749 P.2d 154. If the Jordans had changed their minds about the transfer anytime during the 10 years before OSPI was formed, the conveyance would have failed. See Zulver Realty Co. v. Snyder, 191 Md. 374, 382, 62 A.2d 276 (1948) (saying that a deed to a supposed corporation does not pass any title where the corporation has not been duly incorporated and consequently has no legal existence).
¶ 32 Delivery of the deed to OSPI could have been accomplished if the Jordans still intended to make the transfer at the time the articles were filed. The Jordans' intent at that time is a question of fact. See Niemann v. Vaughn Cmty. Church, 154 Wash.2d 365, 377-78, 113 P.3d 463 (2005). Therefore, the Jordans have not shown that the deed was ineffective as a matter of law and are not entitled to summary judgment on this issue.

V. CONCLUSION
¶ 33 Because issues of material fact must still be resolved, we reverse the order of summary judgment. We remand to allow Rawson-Sweet an opportunity to produce sufficient evidence of adequate advice and consideration to resist summary judgment on the question of whether the issuance of shares was void as a matter of law. If Rawson-Sweet cannot make this showing, we direct the superior court to enter an order divesting her of her shares in OSPI.
¶ 34 If Rawson-Sweet is divested of her shares, we direct the superior court to allow her to present evidence of the Sweets' expenditures on behalf of OSPI. If the superior court deems it necessary to prevent the Jordans' unjust enrichment, it may enter a judgment against the Jordans awarding Rawson-Sweet the amount, plus interest, that the Sweets spent to benefit OSPI.[6] The goal would be to return both parties to the position they would have held had the Sweets' shares never been issued.
¶ 35 Reversed and remanded.
We concur: HOUGHTON, P.J., and BRIDGEWATER, J.
NOTES
[1] A lawyer who is representing a client in a matter:

(a) Shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:
(1) The transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;
(2) The client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and
(3) The client consents thereto.
. . .
(c) Shall not prepare an instrument giving the lawyer or a person related to the lawyer as parent, child, sibling, or spouse any substantial gift from a client . . .
RPC 1.8.
[2] "Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise in his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property or personal interests." DR 5-101(A).
[3] "A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure." DR 5-104(A).
[4] "The lawyer should refrain from any action whereby for his personal benefit or gain he abuses or takes advantage of the confidence reposed in him by his client." Canon of Professional Ethics 11 (1967).
[5] Also troubling is that Sweet obtained his interest in OSPI at about the same time that he was facing the loss of his livelihood, having just resigned from the bar amid misconduct charges.
[6] We leave it to the trial court's discretion exactly how broadly to interpret this. We anticipate that this will at least include taxes, maintenance costs, and expenses incurred in litigation.