**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JEFFREY P. BERTELSEN; AMY L.
BERTELSEN, husband and wife and
the marital community comprised
thereof; BERTELSEN FOOD GAS,
INC., a Washington corporation;
RICHARD BERTELSEN; JANIS JO
BERTELSEN, husband and wife and
the marital community comprised
thereof,

        *Plaintiffs-Appellants,*

       v.

ROGER K. HARRIS; ROGER K.
HARRIS PC, an Oregon
professional services corporation;
HARRIS BERNE CHRISTENSEN LLP,
an Oregon limited liability
partnership,

        *Defendants-Appellees.*

No. 06-36020

D.C. No.
CV-04-05135-LRS

OPINION

Appeal from the United States District Court
for the Eastern District of Washington
Lonny R. Suko, District Judge, Presiding

Argued and Submitted
April 10, 2008—Seattle, Washington

Filed August 11, 2008

Before: Carlos T. Bea and Milan D. Smith, Jr.,
Circuit Judges, and Joseph M. Hood,* Senior District Judge.

*The Honorable Joseph M. Hood, Senior United States District Judge
for the Eastern District of Kentucky, sitting by designation.

10249

Opinion by Judge Bea;
Dissent by Judge Milan D. Smith, Jr.

## COUNSEL

Robert B. Gould, Brian J. Waid, Law Offices of Robert B. Gould, Seattle, Washington, for the appellants.

Patrick N. Rothwell, Davis Rothwell Earle & Xóchihua, Seattle, Washington, for the appellees.

## OPINION

BEA, Circuit Judge:

We are called on to decide whether attorney misconduct towards clients, involving violations of rules of professional conduct binding on the attorney, requires forfeiture of the attorneys' fees paid to them when, after all righteous furor is vented, the fees were eminently reasonable for the result produced.

Jeffrey and Amy Bertelsen, their now-defunct company Bertelsen Food & Gas, Inc., and Jeffrey Bertelsen's parents Dr. Richard and Janice Jo Bertelsen ("Appellants"), appeal the district court's judgment after a bench trial in favor of Appellants' former attorney Roger Harris and his law firm ("Appellees") on Appellants' breach of fiduciary duty claims.

Appellants claimed Harris and his firm (1) violated Washington Rule of Professional Conduct ("RPC") § 5.4(a) by agreeing to share legal fees with a nonlawyer; (2) failed to comply with Washington law when they modified their legal fee agreements during the course of representation; (3) overcharged Appellants by miscalculating their contingency fee and failed to comply with RPC § 1.5(c)(3)'s requirement that at the conclusion of a contingency fee matter, the attorney provide his client with a written statement showing the method of contingency fee calculation; and (4) failed fully to inform Appellants of conflicts of interest in their joint representation and obtain written waivers of the conflicts.

Appellants sought disgorgement of $167,500 in fees they paid Harris, his firm, and Harris's non-attorney consultant. The district court determined that, even assuming Harris and his firm breached the fiduciary duties to their clients imposed by the rules of professional conduct for attorneys, the circumstances of this case did not warrant an equitable award of disgorgement of fees.

This case does not call upon us to determine whether Appellees breached their fiduciary duty to their clients as a matter of Washington state law. Nor is this occasion to express opprobrium at an attorney's failure to abide by the rules of professional responsibility in representing his clients. Rather, our task is a limited one: we must decide whether the district court abused its discretion when it declined to award disgorgement of fees. We hold there was no abuse of discretion.

## I.

In the 1990s, Jeffrey and Amy Bertelsen owned six gas stations, which they operated through the now-dissolved Bertelsen Food and Gas, Inc. ("BFG"), a Washington corporation. BFG operated the gas stations under the ARCO brand. BFG ceased operations in December 2000, because it had no money to pay ARCO for gasoline or to pay other vendors for other products. On January 3, 2001, ARCO sent BFG a "notice of termination." The notice stated ARCO's intent to terminate its franchise agreements with BFG in 90 days (on April 9, 2001).

Jeffrey and Amy Bertelsen retained attorney Bill Hames for advice on filing for bankruptcy for the Bertelsens individually and for BFG. Hames advised the Bertelsens to speak with an attorney with experience in the gas franchise industry. In lieu of immediately filing for bankruptcy, Hames and Jeffrey Bertelsen contacted Roger Harris, an Oregon attorney who had gas franchise industry experience.[1] Jeffrey Bertelsen sought Harris's assistance to try to resurrect BFG's relationship with ARCO, so BFG could get gas from ARCO again and continue to use the ARCO brand name. On March 16, 2001, Hames called Harris to discuss BFG and the ARCO termination notice. On March 19, 2001, Harris contacted Ronald McPherson, a non-attorney client of Harris who has expertise in the gasoline franchise industry, and asked him to consult on the BFG matter.

### A. The March 21, 2001 Retainer Agreement

In March 2001, Jeffrey and Amy Bertelsen signed a retainer agreement ("the March 2001 agreement") with Harris and his firm, Harris Berne Christensen LLP. The agreement

---

[1]Although Harris was licensed in Oregon, the parties do not dispute the Washington Rules of Professional Conduct apply to him and Appellants' action is governed by Washington law.

stated the Bertelsens, for and on behalf of BFG, retained Harris and his firm "as attorneys for the purpose of representing and handling any and all legal matters on behalf of [BFG] which may, from time to time, be requested. You have specifically requested that we work to negotiate a resolution of the ARCO franchise terminations and related issues." The agreement also stated BFG would pay the firm on an hourly basis, at its rates of $150-$195/hour for attorneys. The agreement also required BFG to pay a $10,000 retainer, which the Bertelsens paid on or about April 23, 2001.

Jeffrey and Amy Bertelsen received detailed bills describing services rendered between March 2001 and May 2001, with a breakdown of time spent and hourly rates, from Harris's firm. They paid these bills without objection (nor do they claim any breach of fiduciary duty with respect to those bills).

During Spring 2001, it became clear ARCO had no interest in continuing a business relationship with BFG and did not intend to rescind the notice of termination. Indeed, ARCO filed an action against BFG in August 2001 for money due under loan agreements with BFG. The Bertelsens decided they would try to sell the six gas stations as a business solution, to avoid bankruptcy. In May 2001, Jeffrey and Amy Bertelsen asked Harris and McPherson (the non-attorney industry consultant) to seek a buyer for the stations.

## B.   The May 29, 2001 Corporate Resolution

By May 2001, however, Jeffrey and Amy Bertelsen did not have money to pay hourly attorney or consulting fees. They asked Harris and McPherson if they would work on a contingency fee basis; Harris and McPherson agreed.

Harris then drafted a "Terms of Engagement pursuant to Corporate Resolution (Authorization) and Limited Power of Attorney," which Jeffrey and Amy Bertelsen signed on May 29, 2001 on behalf of BFG. The resolution stated BFG

retained "the services of" McPherson and Harris for 90 days (i.e., expiring August 27, 2001). The resolution further stated "Harris and McPherson will be reimbursed for their services associated with the undertaking . . . at the rate of 1% of the gross value of any transaction(s) entered into with third parties plus full reimbursement of all out-of-pocket expenses incurred by Harris and McPherson." The resolution also stated the Bertelsens could terminate the agreement, and Harris and McPherson would be entitled to compensation for work performed at their hourly rates of $195 and $150, respectively. Harris and McPherson agreed to split the contingency fee evenly between themselves ("50/50").[2]

## C.   The September 19, 2001 Corporate Resolution

During the 90-day term of the May 2001 corporate resolution, no buyer for the gas stations was found. As early as July 2001, however, Tesoro Petroleum had expressed interest in doing a deal with BFG, but no offer had come to fruition. At the time of the expiration of the May 2001 corporate resolution on August 27, 2001, Jeffrey and Amy Bertelsen wanted to sign a new contingency fee agreement with Harris and McPherson to continue to try to sell the gas stations. Harris discussed with Jeffrey and Amy Bertelsen the fact the new agreement would be based on a 1.5% contingency (up from 1%).

On September 19, 2001, Jeffrey and Amy Bertelsen, on behalf of BFG, signed a revised corporate resolution and limited power of attorney. The term of the agreement was for one year and stated Harris and McPherson would receive "1.5% of the gross value of any transaction(s) entered into with third

---

[2]The corporate resolution did not state Harris and McPherson would split the contingency fee. Harris, however, testified he told the Bertelsens of the 50/50 arrangement and the Bertelsens agreed to it. The record does not state whether the Bertelsens admitted they were aware of the 50/50 arrangement, and the district court did not make a finding on that point.

parties plus full reimbursement of all out-of-pocket expenses." Like the May 2001 corporate resolution, the September 2001 corporate resolution stated the Bertelsens could terminate the agreement and Harris and McPherson would be entitled to compensation at their hourly rates of $195 and $150, respectively.

## D.    The Tesoro Transaction

At some point, Tesoro agreed to enter into a lease/option to buy agreement with BFG. On September 20, 2001 (the day after the Bertelsens signed the September 2001 corporate resolution), Harris faxed to Tesoro executed signature pages of the "Tesoro/Bertelsen Agreement to Lease."[3] Tesoro agreed to lease BFG's six gas stations for ten years, for more than $60,000 per month.[4] It also paid $1 million for an option to purchase the gas stations for $8.5 million. Tesoro never exercised the option.

The transaction closed on October 31, 2001. Harris determined the contingency fee under the agreement would be $142,500, which he calculated by taking 1.5% of $9.5 million —the $1 million Tesoro paid for the option plus the $8.5 million option price (even though Tesoro never exercised the option). Jeffrey and Amy Bertelsen received correspondence from Harris prior to the October 31, 2001 closing that showed this $142,500 contingency fee. At the October 31, 2001 closing, Jeffrey and Amy Bertelsen did not object to the fee. The

---

[3]Also on September 20, 2001, Harris faxed McPherson a cover sheet stating: "Hallelujah! Please find attached the signed Power of Attorney and corporate resolution authorizing our work. I will move ahead and execute the Tesoro documents."

[4]This is according to the district court's findings of fact. An executed copy of the lease agreement is not in the record before this court. Instead, the parties have included a September 15, 2001 draft of the agreement; according to that draft, the lease was a triple net lease, with a fixed annual rate of $722,500 for years 1 through 5, increased by 10% to $794,750 annually for years 6 through 10.

Bertelsens do not claim they were afraid the Tesoro transaction would not go forward if they did not agree to the contingency fee or if they had not agreed to the terms of either of the May or September 2001 corporate resolutions.

The invoice Harris's firm sent to BFG described the services billed as "Services rendered from June 1, 2001 through October 31, 2001 pursuant to that Limited Power of Attorney and Terms of Engagement as revised and extended, including services rendered by consultant, Ron McPherson." The space under the heading on the invoice for "Hours" was blank. Under "Amount," the invoice simply stated "$142,500." The invoice did not explain how the amount of the contingency fee was calculated; nevertheless, the Bertelsens paid the fee.

Harris's firm paid McPherson $70,000 as his part of the fee. Harris received $72,500. Jeffrey Bertelsen testified he "did not feel that Mr. McPherson did anything improper and that Mr. McPherson earned his $70,000 of this $142,500 payment."[5]

Written records showing the exact number of hours Harris spent on marketing and putting together the gas station transaction no longer exist. Harris testified he recalled that, during the period from May 29, 2001 to October 31, 2001, he spent approximately 400 hours on the matter. Based on his hourly rate of $195, his fee on an hourly basis would have been at least $78,000—more than his half of the contingency fee.

## E.   The ARCO Litigation

On August 10, 2001, ARCO filed an action in Washington state court against BFG, Jeffrey and Amy Bertelsen, and Dr. and Mrs. Bertelsen (Jeffrey Bertelsen's parents). ARCO claimed the Bertelsens and BFG defaulted on loan agree-

---

[5]Nevertheless, Appellants seek to recover the entire $142,500 fee from Harris and his firm in this action.

ments. ARCO further claimed the loans were personally guaranteed by Jeffrey and Amy Bertelsen, as well as by Dr. and Mrs. Bertelsen. At the time the action was filed, none of the Bertelsens recalled Dr. and Mrs. Bertelsen as having personally guaranteed the loans.

Dr. Bertelsen knew Harris was representing his son in the ARCO lawsuit. After he was served with ARCO's complaint, Dr. Bertelsen contacted Harris and set up a meeting in September 2001. Prior to the meeting, Harris sent a letter dated August 30, 2001, to Dr. and Mrs. Bertelsen enclosing documents that ARCO's counsel provided to Harris that "purport[ed] to be" personal guarantee agreements signed by Dr. and Mrs. Bertelsen. Harris stated he had "some question about the validity of these signatures."

At the September 2001 meeting, Harris "discussed potential conflicts that could arise in representing all the Bertelsens and suggested to Dr. and Mrs. Bertelsen that they confer with their own counsel to evaluate whether they should be separately represented." During the meeting, Harris explained "the possible conflict that might arise in the future if the Bertelsen family clients did not agree upon a trial strategy or began 'finger pointing' at one another." Harris did not recall whether he discussed with the Bertelsens the potential conflict of interest between Dr. and Mrs. Bertelsen as guarantors, and Jeffrey and Amy Bertelsen as debtors.

After the meeting, Harris sent Dr. and Mrs. Bertelsen a letter dated September 7, 2001, to "confirm[ ] the substance" of their meeting. Harris noted his firm had been retained to defend the interests of Dr. and Mrs. Bertelsen, as well as Jeffrey and Amy Bertelsen and BFG. He further stated: "We understand those interests to be, in large part, identical and I understand that you have waived any conflict that may arise. At this point in time I am not aware of any such conflict, and have so informed you."

The letter enclosed the firm's retainer agreement, which Dr. and Mrs. Bertelsen signed and returned.

## F.   The October 23, 2001 Waiver

On October 22, 2001, Harris sent another letter to Dr. and Mrs. Bertelsen. In the letter, Harris stated: "We are agreed, following extended discussion and full disclosure, that there is no conflict of interest and that all parties will proceed in an effort to fully defend against the allegations and the claims made by ARCO and will assert all affirmative defenses, off-sets, discounts and counterclaims that might be available to any and all parties in that litigation."[6] The Harris letter also noted Dr. and Mrs. Bertelsen agreed to assume the obligation of paying for the litigation, because Jeffrey and Amy Bertelsen and BFG lacked the resources to do so.

The Harris letter then discussed the Tesoro transaction and a potential conflict of interest created by requirements Tesoro was imposing. Tesoro required Dr. and Mrs. Bertelsen to reconvey the deeds of trust they had against the six gas station properties to reduce the amount of debt of record. Tesoro also required Dr. and Mrs. Bertelsen, along with all secured lenders, to execute a Non-Disturbance and Attornment Agreement. The Harris letter explained:

> These requirements, imposed by Tesoro, . . . create a potential conflict of interest between our representation of Jeff and Amy Bertelsen and [BFG] and you [i.e., Dr. and Mrs. Bertelsen] in connection with the proposed transaction. Jeff and Amy Bertelsen and [BFG] desire that you execute the deeds of recon-

---

[6]The letter also stated: "We have agreed that we will vigorously contest this matter working initially to extricate you from the lawsuit and ensure that if any liability is incurred, it will be primarily, if not exclusively, borne by Jeff and Amy Bertelsen and [BFG]. Jeff and Amy Bertelsen have agreed to this approach and litigation strategy."

veyance and Non-Disturbance Agreement, pursuant to Tesoro's Agreement to Lease.[7] Therefore, we recommend that you seek new and separate legal counsel with respect to this matter in order to determine your rights, remedies and obligations under the proposed transaction with Tesoro.

In consideration for Dr. and Mrs. Bertelsen's compliance with Tesoro's requirements, Jeffrey and Amy Bertelsen agreed, among other things, to assume all defense costs in connection with the ongoing ARCO litigation against all Bertelsens, indemnify Dr. and Mrs. Bertelsen against any judgment against them by ARCO, and assume payments on a loan secured by Dr. Bertelsen.

Finally, in the letter, Harris stated that, if Dr. and Mrs. Bertelsen chose to proceed to discuss the matter with him without the benefit of new legal counsel, he required them to sign an attached waiver. The waiver stated: "We, separately and as husband and wife, hereby waive any and all conflict of interest as to the representation of Harris Berne Christensen LLP for and in connection with the proposed transaction under the Agreement to Lease, by and between Tesoro West Coast Petroleum Company and Jeff and Amy Bertelsen and [BFG]."

Dr. and Mrs. Bertelsen signed the waiver on October 23, 2001, and did not seek independent counsel. Jeffrey and Amy Bertelsen were not asked to sign this conflict waiver.

---

[7]In other words, Dr. and Mrs. Bertelsen had to give up their secured status by reconveying their title (held as security), as well as agree to keep in place the lease agreement between BFG and Tesoro, should ownership of the gas stations eventually fall into Dr. and Mrs. Bertelsen's hands. The letter noted this would create a potential conflict of interest for Harris, representing Jeffrey and Amy Bertelsen on the one hand, who want the deal to go forward, and Dr. and Mrs. Bertelsen on the other hand, who would have to give up their security interests in the real property.

## G. The October 29, 2001 Letter

On October 29, 2001, Harris sent a letter to Jeffrey and Amy Bertelsen, and Dr. and Mrs. Bertelsen. The letter "summarize[d], describe[d] and memorialize[d] [the parties'] resolution and understanding of the disposition of the various debts, liens against real property and financing of the ongoing litigation with ARCO," and stated the parties "acknowledge[d] the rights and obligations" pursuant to the Tesoro Lease Agreement. The letter set forth the agreement among the Bertelsens under the terms of the October 23, 2001 waiver letter.

The final paragraph of the letter stated: "I ask that each of you review this document and if consistent with your understanding of the arrangements made, please execute as shown below . . . You have been previously advised and it is again recommended that you seek separate legal counsel in connection with this matter in order to be fully advised with respect to your rights, remedies and obligations herein." On October 30, 2001, Dr. and Mrs. Bertelsen signed the agreement; on October 31, 2001, Jeffrey and Amy Bertelsen signed the agreement. The document does not discuss any potential or actual conflict of interest created by Harris's representation of the parties in entering into the terms of the agreement outlined in the letter.

Throughout the ARCO litigation, neither Jeffrey Bertelsen nor Dr. Bertelsen thought Harris failed to render effective legal representation or behaved in any manner detrimental to any of the Bertelsens because of Harris's joint representation of them. No party challenged the amount of fees and costs billed in the invoices Harris sent to the Bertelsens. Dr. and Mrs. Bertelsen paid a total of $80,000 in fees and costs to Harris for the ARCO litigation, $35,000 of which Jeffrey and Amy Bertelsen reimbursed to Dr. and Mrs. Bertelsen. Dr. and Mrs. Bertelsen seek disgorgement of the remaining $45,000 from Appellees in the instant action.

Events in September and October 2002 led Harris to conclude he must withdraw from representing all the Bertelsens. First, in September 2002, Amy Bertelsen told Harris that Jeffrey Bertelsen had paid a vendor a $3,000 "kickback" for generating a false invoice, which Jeffrey Bertelsen somehow used to obtain approximately $178,000 of funding from ARCO for work he never intended to be done.[8] Then, in October 2002, during settlement negotiations with ARCO, the Bertelsens began taking conflicting positions with respect to settlement. Jeffrey and Amy Bertelsen claimed they had no cash to contribute to a settlement with ARCO, while Dr. Bertelsen was not willing to contribute enough money out of his own pocket to fund the settlement. Further, Amy Bertelsen wanted to be relieved of the indemnity agreements Jeffrey Bertelsen and she had signed indemnifying Dr. and Mrs. Bertelsen for any losses which their guarantees might occasion.

After these events, Harris—after consultation with the Oregon State Bar Association and ethics counsel—decided he must withdraw as counsel as to all four of the Bertelsens, and so informed them. Harris advised the Bertelsens to seek new counsel. Ultimately, all four Bertelsens settled with ARCO—Jeffrey Bertelsen dealt directly with ARCO, while Dr. Bertelsen retained an attorney to review the Bertelsen-ARCO settlement agreement. Pursuant to the settlement agreement, Dr. and Mrs. Bertelsen paid ARCO $225,000, while Jeffrey and Amy paid ARCO $550,000.[9]

---

[8]Neither the district court decision nor the record explains the details of the alleged kickback scheme. The district court made no finding whether Jeffrey Bertelsen in fact engaged in such a scheme, only that Amy Bertelsen told Harris that Jeffrey Bertelsen had engaged in such a scheme and that Jeffrey Bertelsen did not deny he did so.

[9]In its complaint ARCO sought $2,015,232 plus interest from the Bertelsens jointly and severally.

## II.

On December 20, 2004, Appellants filed a complaint against Harris and his law firm in federal district court invoking diversity of citizenship jurisdiction. Appellants claimed Appellees breached their fiduciary duties when they violated various sections of the Washington Rules of Professional Conduct ("RPC").[10] Appellants sought disgorgement of attorneys' fees paid to Harris, plus interest and their own attorneys' fees.

After a five-day bench trial, the district court entered judgment in Appellee attorneys' favor and dismissed Appellants' claims. The court issued an oral ruling, which it then supplemented with Findings of Fact and Conclusions of Law. The court found as follows.

### A. Claims relating to the May and September 2001 "Corporate Resolutions"/Contingency Fee Agreement

#### 1. Unlawful fee-splitting

Appellants claim Harris and his firm breached their fiduciary duty by entering into the May and September 2001 "corporate resolutions" under which Harris and McPherson would share the contingency fee. They claim the agreement violated RPC § 5.4(a), which prohibits a lawyer or law firm from sharing legal fees with a nonlawyer.[11] The district court made no finding as to whether the May and September 2001 agreements violated RPC § 5.4(a).

---

[10]Appellants also alleged Appellees violated the Washington Consumer Protection Act, Wash. Rev. Code § 19.86.020 *et seq.*, and committed legal malpractice. The district court entered judgment in Appellee attorneys' favor on those claims; Appellants have abandoned those claims on appeal.

[11]RPC § 5.4 provides various exceptions to this rule; no party contends any of these exceptions apply here.

## 2.  Improper modification of the fee agreement

Appellants also claimed the May 2001 corporate resolution, which provided for a 1% contingency fee, was a modification of the hourly fee agreement in the March 2001 retainer agreement, and this modification did not comply with Washington law.[12] The district court found the May 2001 corporate resolution was not a modification of the fee agreement in the March 2001 hourly retainer agreement.[13] The court further held even if either the May or the September 2001 corporate resolutions modified the March 2001 hourly fee agreement, Harris did not breach his fiduciary duty by modifying the agreement to provide for a contingency fee; the agreements complied with Washington law because they were "fair and reasonable, made after full disclosure and free of undue influence based on the standards set out in *Ward v. Richards & Rossano, Inc.*"

## 3.  Contingency fee over-charge and failure to set forth the method for calculating the fee

Appellants also claimed Harris over-charged them under the September 2001 corporate resolution, by calculating the 1.5% fee based in part on the price of Tesoro's option to pur-

---

[12]Under Washington law, when an attorney's fee agreement is renegotiated after the attorney-client relationship is established, the fee modification is "void or voidable until the attorney establishes that the contract with his client was fair and reasonable, free from undue influence, and made after a fair and full disclosure of the facts upon which it is predicated." *Ward v. Richards & Rossano, Inc.*, 754 P.2d 120, 124 (Wash. Ct. App. 1988) (internal quotation marks and citation omitted).

[13]Specifically, the district court found the May 2001 corporate resolution and the March 2001 retainer agreement were separate agreements: the March hourly retainer dealt with Harris's "work in trying to resurrect the Bertelsen[s'] business relationship with ARCO. The May [2001] corporate resolution dealt with the potential sale of the six gas stations through the efforts of Mr. Harris and Mr. McPherson." The district court also held the subsequent September 2001 corporate resolution was not a modification of the May 2001 corporate resolution, because the May 2001 resolution had expired by its own terms.

chase the stations, which it had not exercised.[14] The district court made no findings as to this claim. It also made no findings as to Appellants' claim that Harris breached his fiduciary duty by violating RPC § 1.5(c)(3), which requires "[u]pon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter and, if there is a recovery, showing the remittance to the client and the method of its determination."

The district court held, even if Jeffrey and Amy Bertelsen had a valid breach of fiduciary duty claim as to the May and September 2001 corporate resolutions, the claim was barred by Washington's three-year statute of limitations for such actions, because the Bertelsens did not file their action until December 2004.

## B.  Conflict of Interest

Appellants also claim Harris and his firm breached their fiduciary duty by failing fully to advise Appellants of potential conflicts of interest and to obtain written waivers of the conflicts during the ARCO litigation. The district court found no breach of fiduciary duty. The district court held Appellants waived the conflict of interest at the outset of the ARCO litigation, Harris "continually" advised Appellants to seek independent counsel, and Harris did not favor one client over another during the ARCO litigation.

---

[14]Appellants contend Harris thus breached his fiduciary duty by violating RPC § 1.5(c)(4): "A contingent fee consisting of a percentage of the monetary amount recovered for a claimant, in which all or part of the recovery is to be paid in the future, shall be paid only (i) by applying the percentage to the amounts recovered *as they are received by the client*; or (ii) by applying the percentage to the actual cost of the settlement or award to the defendant." (emphasis added).

## C. Disgorgement

Most importantly for this appeal, the district court held: "Assuming for the sake of argument that all of plaintiffs' assertions concerning violations of RPCs are true, this judicial officer cannot conclude that the conduct of Harris and his firm was so egregious as to justify disgorgement of fees paid." The court noted "the consulting arrangement with McPherson could easily have been provided in a separate document." Moreover, while Appellants "understandably" took issue with the fees paid in the Tesoro transaction "since they were based on an option that was never exercised, this judicial officer infers that the fee was ultimately reasonable, given the testimony of all concerned, and specifically the fees paid to McPherson, the description of the services provided and the result achieved." Finally, the court stated it did "not find that there is sufficient grounds for disgorgement or sufficient equitable concerns . . . to justify disgorgement based upon the evidence."

As to the breach of fiduciary duty claim based on the purported conflict of interest, the court held disgorgement of fees was not warranted because "[t]here is no showing that the giving of independent advice to the plaintiffs at the times material to plaintiffs' claims would have changed the strategic positions taken by them or the ultimate outcome of either the Tesoro transaction or the Arco litigation."

## III.

We review the district court's findings of fact after a bench trial for clear error and review the district court's conclusions of law *de novo*. *Lentini v. Cal. Ctr. for the Arts, Escondido*, 370 F.3d 837, 843 (9th Cir. 2004). Whether an attorney's conduct violates a rule of professional conduct is a question of law. *Eriks v. Denver*, 824 P.2d 1207, 1211 (Wash. 1992). We review a trial court's decision whether to award disgorgement of fees for an attorney's breach of his fiduciary duty for abuse

of discretion. *See Kelly v. Foster*, 813 P.2d 598, 602 (Wash. Ct. App. 1991).

## IV.

The *only* damages Appellants seek here for their various claims of breach of fiduciary duty is disgorgement of attorneys' fees paid to Appellees, plus interest and their own attorneys' fees and costs in prosecuting this disgorgement claim. Note, Appellants do *not* claim they suffered any injury by the actions of Harris and his firm, apart from having to pay their attorneys' fees. That is, they do not complain Harris and his firm bungled their extrications from the ARCO contract, nor that Harris brought about a disadvantageous lease with Tesoro. Of course, they do not complain about Harris keeping them out of bankruptcy.

**[1]** Under Washington law, disgorgement of fees is a remedy committed to the discretion of the trial court: "Disgorgement of fees is a reasonable way to discipline specific breaches of professional responsibility, and to deter future misconduct of a similar type. Such an order is within the inherent power of the trial court to fashion judgments." *Eriks*, 824 P.2d at 1213 (internal quotation marks and citation omitted). A court is not required to order disgorgement, even where a breach of fiduciary duty is proven. *See Kelly*, 813 P.2d at 602. A court's refusal to disgorge fees, whether a breach of fiduciary duty is proven or not, is overturned only for an abuse of discretion. *Id.*

The district court explicitly stated, even assuming Appellants had established their breach of fiduciary duty claims, the court nevertheless would not order disgorgement. In other words, the district court held, even if its legal conclusions on the merits of Appellants' claims were incorrect—as the dissent contends—the court would not order disgorgement on this set of facts. We hold the district court did not abuse its discretion in so holding.

Washington state law does not set forth particular factors a trial court must consider to decide whether to order disgorgement, or factors we must consider to determine whether the trial court abused its discretion in rendering that decision. We find *Kelly v. Foster*, 813 P.2d 598 (Wash. Ct. App. 1991), instructive. Kelly, the sole beneficiary of her uncle's estate, brought an action for breach of fiduciary duty against attorney Foster, who represented the estate's executor. *Id.* at 599. Foster recommended the estate sell its land to a third party below market value, but failed to disclose he had an interest in the land sale; after the sale, the third party sold part of the land to Foster and his wife. *Id.* The jury found Foster breached his fiduciary duty to Kelly and awarded damages of $85,000. *Id.* at 600. The trial court denied Kelly's motion for disgorgement of fees. *Id.* The Washington Court of Appeals affirmed. It held "the trial court did not find factors present in this case justifying a reimbursement to Kelly of attorney's fees paid by the estate. Such a ruling is well within the court's discretion and will not be overturned." *Id.* at 602.

In contrast to *Kelly*, Appellants here claim *no* damages caused by Appellees' purported breach of fiduciary duty, apart from the attorneys' fees they want reimbursed. *Compare with Cotton v. Kronenberg*, 44 P.3d 878 (Wash. Ct. App. 2002) (affirming award of disgorgement of fees in breach of fiduciary duty action where criminal defense attorney took title to his client's real property as his retainer fee, sold the property, and then refused to refund the unearned balance of his fees after prosecutors successfully moved to remove the attorney from representation of the client for having tampered with a prosecution witness).

**[2]** As in *Kelly*, the district court here found the equities did not justify an award of disgorgement of fees, for several reasons. Foremost, it held the $72,500 contingency fee paid to Appellees was reasonable for the work done and value of the Tesoro transaction. This is an eminently reasonable conclusion, given that Harris and McPherson's work led to a multi-

million dollar rental deal, kept the six gas stations as Bertelsen property, and prevented Appellants from having to file for bankruptcy.[15] Indeed, Jeffrey Bertelsen admitted he thought non-attorney McPherson "earned" his half of the contingency payment. The district court did not abuse its discretion by concluding Harris and his firm also "earned" their own half of the fee. Further, the district court concluded there was no evidence independent advice would have changed the positions taken by Appellants or affected the outcome of either the ARCO litigation or the Tesoro transaction. In the court's opinion, Appellees' alleged misconduct simply did not rise to the level of conduct that warrants an equitable award of disgorgement of fees.[16]

There is no basis upon which to find the district court abused its discretion by refusing to order disgorgement of fees. Whether the district court made an error of law in its assessment of the merits of Appellants' breach of fiduciary duty claims, as the dissent contends, is of no moment to our

---

[15]We do not establish a rule that an attorney is excused from a breach of fiduciary duty where his work achieves a "favorable" result. The attorney still is liable for actual damages, if any. Rather, we hold that, under Washington state law, a trial court does not abuse its discretion when it considers the result achieved and reasonableness of the fee when determining whether to award disgorgement of fees. And, contrary to the dissent's approach, we recognize we cannot substitute our own judgment for that of the trial court as to what circumstances merit such an award. Our task is to review the determination of the trial court, to whose sound discretion the award of disgorgement of fees is committed. "My brother and I differ on what is the appropriate appellate function. He would retry. I am content to review." *Li v. Ashcroft*, 378 F.3d 959, 964 n.1 (9th Cir. 2004) (Farris, J.). Here, the determination of the district court not to award disgorgement does not rise to the level of abuse of discretion.

[16]Contrary to Appellants' contention, the district court did not misapply Washington law by purportedly requiring Appellants to prove Appellees' conduct caused them harm and to prove such conduct was "egregious." Rather, the district court assessed the circumstances of this case and concluded they did not warrant the exercise of its discretion to award disgorgement of fees.

determination whether the court abused its discretion as to the remedy. Remember: In *Kelly*, there was a finding of breach of fiduciary duty and damages caused thereby ($85,000), but there was no disgorgement of fees kept by the errant attorney. Here, the district court considered the facts and circumstances of this case and determined they did not warrant a discretionary award of disgorgement of fees. It gave multiple, sound reasons for doing so. The district court acted within its discretion in refusing to order disgorgement of fees. *See Kelly*, 813 P.2d at 601.

We acknowledge that disgorgement of attorney's fees serves an important goal: "It deters attorney misconduct, a goal worth furthering regardless of whether a particular client has been harmed." *Hendry v. Pelland*, 73 F.3d 397, 402 (D.C. Cir. 1996). Similarly, rules of professional conduct serve a critical role to maintain the integrity of the legal profession and ensure an attorney abides by his duty as his client's fiduciary. Of course, nothing herein is meant to excuse Harris for any breach of his professional duties imposed by Washington State's Rules of Professional Conduct, should that State's Bar proceed against him for sanctions. *See* Wash. Rules for Enforcement of Lawyer Conduct § 1.1 *et seq.*; *In re Gillingham*, 896 P.2d 656, 660 (Wash. 1995) (en banc) ("Attorney misconduct is defined by the RPC, and any violation of the RPC may be grounds for attorney discipline.").

**[3]** But, under Washington law, the award of disgorgement of fees is not mandatory even where the attorney who got the fees also violated Washington's Rules of Professional Conduct for attorneys; instead, whether to order disgorgement is placed firmly within the discretion of the trial court. *See Kelly*, 813 P.2d at 601. Here, the district court made a considered determination that the circumstances did not warrant disgorgement of fees. Whether or not the district court erred in its assessment of the merits of Appellants' breach of fiduciary duty claims—an issue we do not reach—it did not abuse its

discretion when it declined to award disgorgement on this set of facts. We affirm its judgment on that basis.

**AFFIRMED.**

---

MILAN D. SMITH, JR., Circuit Judge, dissenting:

I respectfully dissent. My colleagues in the majority make light of Appellants' assertions regarding the conduct of Harris and his law firm (collectively, Harris), suggesting that because the economic result achieved was ultimately favorable to Appellants, and because the district court is owed discretion in whether to disgorge attorney's fees, it is unnecessary to decide whether Harris breached the Washington Rules of Professional Conduct (RPC) and his fiduciary duties. In the words of the majority, "after all righteous furor is vented, the fees were eminently reasonable for the result produced." Maj. Op. at 10253. In my view, Harris's breaches of the RPC and his fiduciary duties are plain, and the majority's conception of attorneys' fiduciary duties is the legal equivalent of holding that a trustee who misappropriates money from a trust and gambles those funds at the racetrack is excused from his breach of fiduciary duty, and is entitled to his trustee fees, so long as he wins enough at the track to permit him to timely return the misappropriated money to the corpus of the trust. Washington law does not support such a legal theory of relativity concerning an attorney's breach of his fiduciary duties.

Under Washington law, it is well established that "the attorney-client relationship is a fiduciary one as a matter of law and thus the attorney owes the highest duty to the client." *Perez v. Pappas*, 659 P.2d 475, 479 (Wash. 1983) (en banc); *VersusLaw v. Stoel Rives, LLP*, 111 P.3d 866, 878 (Wash. Ct. App. 2005); *Kelly v. Foster*, 813 P.2d 598, 601 (Wash. Ct. App. 1991). When acting as a fiduciary, attorneys "have a

duty to act in and for the client's best interests *at all times* and to act in complete honesty and good faith to honor the trust and confidence placed in them." *Kelly*, 813 P.2d at 600-01 (emphasis added).

In affirming the district court, the majority relies on the district court's conclusion that even if all of Appellants' claims against Harris were true, Harris's conduct was not "so egregious as to justify disgorgement of fees paid." But neither the majority nor the district court closely examined Appellants' claims regarding Harris's violations of his fiduciary duties and the RPC, matters which this court reviews de novo. *See Eriks v. Denver*, 824 P.2d 1207, 1211 (Wash. 1992) (en banc) (stating that whether an attorney's conduct violates the relevant rules of professional conduct is a question of law); *see also Lentini v. Cal. Ctr. for the Arts*, 370 F.3d 837, 843 (9th Cir. 2004) (stating that a district court's conclusions of law following a bench trial are reviewed de novo).

I agree that the question of whether to disgorge fees is a matter committed to the discretion of the trial court, and that even when a breach of fiduciary duty is proven, a trial court is not necessarily required to order disgorgement. *See Kelly*, 813 P.2d at 602. However, if an attorney is guilty of gross misconduct in violation of public policy, the attorney may not be entitled to any fees. *See Ross v. Scannell*, 647 P.2d 1004, 1011 (Wash. 1982) (en banc); *Kelly*, 813 P.2d at 601.

As demonstrated below, Harris violated the RPC and his fiduciary duties to Appellants in numerous ways, some of which were egregious. Given the obvious nature of these multiple violations, some of which the district court did not consider at all, the district court "committed a clear error in judgment" in concluding that Harris did not violate the RPC or breach his fiduciary duties such that disgorgement may be appropriate, and that even if he did so his conduct was not egregious so as to warrant the disgorgement of fees. *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782,

798 (9th Cir. 2005) (stating that abuse of discretion review requires the appellate court to uphold a district court's exercise of discretion unless the court has "a definite and firm conviction that the district court committed a clear error of judgment in the conclusion it reached") (citation and internal quotations omitted). Instead of affirming the district court, this court should conclude that the district court abused its discretion and remand the case to the district court so that it may consider in the first instance what, if any, remedy is appropriate in light of Harris's egregious misconduct.

A review of Appellants' most persuasive claims reveals that Harris violated the plain language of the RPC due to the method by which he calculated the contingency fee, the invoice's deficient explanation of how the fee was calculated, and by representing clients with conflicting interests without obtaining the requisite written consent.

First, RPC § 1.5(c)(4) provides, in relevant part, that a contingent fee "in which all or part of the recovery is to be paid in the future, shall be paid only by applying the percentage *to the amounts recovered as they are received by the client.*" (Emphasis added.) When Harris billed Jeffrey and Amy for a 1.5% contingency fee on October 31, 2000, the only money they had received as a result of their transaction with Tesoro (or were guaranteed to receive) was $1 million. Yet, Harris took a $142,500 contingency fee, which was based upon the sum of the $1 million Jeffrey and Amy were guaranteed to receive *plus* an $8.5 million option granted to Tesoro, even though the $8.5 million option was never exercised. RPC § 1.5(c)(4) is clear that no contingency fee is to be paid on a sum until payment is "received by the client," and there is no dispute that Jeffrey and Amy never received the $8.5 million sum incorporated into the contingency fee calculation. *In short, Harris took $127,500 to which he was not entitled under the RPC.* That is egregious conduct by any measure and is, to my mind, little different from an attorney misappropriating money from his client trust account.

The majority would undoubtedly contend that everything worked out well overall for Appellants and, accordingly, they have no basis to complain. But that view of an attorney's fiduciary duty ignores the plain language of the RPC and Washington case law. It also sends a message that courts need not strictly enforce the RPC against those sworn to uphold the rule of law as long as a client receives a favorable result. Moreover, it is not clear under the majority's logic whether Harris would have been allowed to retain the fee he obtained in violation of the RPC if the results he obtained for his client were much less favorable, or how "favorable" a result must be in order to ignore a lawyer's breach of his fiduciary duty. Similarly, the district court's view that the contingency fee paid was, on the whole, "reasonable" given the services rendered and the results achieved was also in error. The reasonableness of the fee does not determine whether violations of the RPC occurred in the first instance. Like the majority, the district court ignores the plain language of the RPC.

Second, the invoice setting forth the contingency fee was itself a violation of the RPC. RPC § 1.5(c)(3) provides that if there is recovery in a contingent fee matter, the lawyer shall provide the client a written statement of "the outcome of the matter . . . showing the remittance to the client and the method of its determination." Harris violated this rule by failing to issue a written statement showing how he calculated the contingency fee. *See In re Heard*, 963 P.2d 818, 824 (Wash. 1998) (en banc) (holding that attorney violated RPC § 1.5(c)(1) when he failed to provide a client "with a written statement stating the outcome of the matter and . . . showing the remittance to the client and the method of its determination").

Third, the May and September 2001 corporate resolutions constitute illegal fee-splitting agreements in violation of RPC § 5.4(a). RPC § 5.4(a) prohibits a lawyer from "shar[ing] legal fees with a nonlawyer." The record is clear that Harris and McPherson, a non-attorney, agreed to split the contin-

gency fee paid under the corporate resolutions. Moreover, nothing in the record indicates that the fee was split pursuant to a pre-existing agreement between the non-attorney and the clients so as to ensure that the portion of contingency fee the non-attorney was paid corresponded with work that was non-legal in nature. *Cf. In re Marshall*, 157 P.3d 859, 864-67 (Wash. 2007) (en banc) (upholding a split fee where non-attorney had pre-existing agreement with the client to receive 10% of the final settlement and agreement with attorney merely carried out pre-existing agreement). As a result, it appears that the corporate resolutions violated the plain language of RPC § 5.4(a) and were, therefore, unenforceable. *See Valley/50th Ave., L.L.C. v. Stewart*, 153 P.3d 186, 189 (Wash. 2007) (en banc) ("Attorney fee agreements that violate the RPCs are against public policy and unenforceable.").[1]

Finally, Harris violated RPC § 1.7 by representing clients with conflicting interests without first obtaining the requisite written consent. RPC § 1.7 provides that an attorney "shall not represent a client if the representation involves a concurrent conflict of interest," but authorizes such representation if, among other requirements, "*each affected client gives informed consent*, confirmed in writing." (Emphasis added.) This requirement applies to both actual and potential conflicts of interest. *See In re Marshall*, 157 P.3d at 870 ("[RPC 1.7] requires full disclosure of *potential* conflicts and written consent of the client where multiple representation *may* materially affect the client's case.") (emphasis in original); *In re Egger*, 98 P.3d 477, 486 (Wash. 2004) (en banc) (same). In this case, there was a clear potential conflict of interest when Harris, who was already representing Jeffrey, Amy and BFG

[1]Because the September 2001 corporate resolution under which Harris collected his fee was unenforceable due to this violation of RPC § 5.4(a), I do not regard the three-year statute of limitations that applies to actions for breach of fiduciary duty, Wash Rev. Code. § 4.16.080, as a bar to this action. *See In re Ocean Shores Park*, 134 P.3d 1188, 1193 (Wash. Ct. App. 2006) ("The statute of limitations does not apply where an act or instrument is void at its inception.") (citations omitted).

in their litigation with ARCO, took on the representation of Richard and Janis Bertelsen in the same litigation. ARCO sued Richard and Janis on the basis of alleged personal guarantees on promissory notes signed by Jeffrey, Amy, and BFG. If Richard and Janis were guarantors for the debts of Jeffrey, Amy, and BFG, their interests would clearly be adverse to those of Jeffrey, Amy, and BFG since it is hornbook law that guarantors who pay the debts of third-party obligors have a claim against those obligors for the amounts they pay on the guaranteed debt. Although Harris represented to Richard and Janis in a letter dated September 7, 2001 that he was not aware of any conflict "at [that] point in time," the letter also stated Harris' understanding that Richard and Janis "waived any conflict that may arise." This suggests that Harris recognized a potential conflict as of September 7, 2001.

Despite this potential conflict, Harris did not obtain the written consent of each individual affected—Jeffrey, Amy, Richard or Janis—before moving forward with the representation of all of the Bertelsens, nor did he describe in writing the specific nature of the conflict he thought might arise. Moreover, Harris did not obtain any written waiver of conflicts from Richard and Janis until October 22, 2001, and the only written consent Harris ever received from Jeffrey and Amy was given in response to an October 29, 2001 letter. But that letter did not expressly state that Jeffrey and Amy's signatures represented their consent to waive any conflicts. Rather, the letter summarized the disposition of various debts, liens, and the ongoing ARCO litigation, and requested that if the document was consistent with the Bertelsens' understanding of the arrangements made, they were to sign and return the document. On this basis, I conclude that Harris breached his fiduciary duties by not obtaining the written consent of every client affected by his decision to undertake the representation of Richard and Janis, in violation of RPC § 1.7.

Harris's violations of the RPC and his breaches of fiduciary duty were numerous and egregious. Accordingly, I conclude

that the district court abused its discretion in concluding that Harris did not violate the RPC or breach his fiduciary duties such that disgorgement was appropriate, and that even if he did, his conduct was not egregious so as to warrant the disgorgement of fees. Thus, I would remand to the district court so that it may consider in the first instance what remedy is appropriate in light of Harris's egregious breaches of his fiduciary duties to his clients.